## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GHASSAN ABDULLAH AL SHARBI, by his
father and next friend, Abdullah Al Sharbi )

          Petitioner,

    v.

GEORGE W. BUSH, President of the United
States; DONALD RUMSFELD, United States
Secretary of Defense; GORDON R. ENGLAND,
Secretary of the United States Navy; JOHN D.
ALTENBURG, JR., Appointing Authority for
Military Commissions, Department of Defense;
Brigadier General JAY HOOD, Commander,
Joint Task Force, Guantánamo Bay, Cuba, and
Colonel MICHAEL BUMGARNER,
Commander, Joint Detention Group, Joint Task,
Guantanamo Bay, Cuba

        *Respondents*, all sued in their
official capacities

Civ. Act. No. 1:05-cv-2348

## FIRST AMENDED PETITION FOR WRIT OF *HABEAS CORPUS*
## AND COMPLAINT FOR INJUNCTIVE, DECLARATORY AND OTHER RELIEF

Petitioner, Ghassan Abdullah Al Sharbi ("Al Sharbi") through his undersigned attorney,

files this petition against Respondents for habeas and other relief. On information and belief,

Petitioner alleges that Respondents have held Al Sharbi for more than three years without

demonstrating a valid basis for his detention. They have now charged Al Sharbi with "crimes,"

which they have made up after the fact. Respondents intend to try Al Sharbi for these "crimes"

before a military panel that they have appointed and over which they exercise reviewing

authority. The prospect of this lawless proceeding provides no basis for the continued detention

of Al Sharbi.

In support of his Petition, Al Sharbi alleges as follows:

## INTRODUCTION

1.      Petitioner Ghassan Abdullah Al Sharbi is currently incarcerated at United States Naval Station, Guantánamo Bay, Cuba (hereinafter "Guantánamo Bay"). Upon information and belief, Al Sharbi was seized in or about March 2002, in Pakistan, and was subsequently transferred to the custody of U.S. military and intelligence personnel. **This petition is filed by the authority and the request of petitioner's father and next friend, Abdullah Al Sharbi, P.O. Box 128247, Jeddah 2136, Saudi Arabia.** A copy of such authority and request is attached hereto as EXHIBIT F.

2.      Al Sharbi has been unlawfully detained at the direction of the Respondents for over three years.

3.      On information and belief, there is no basis for Al Sharbi's detention. At no time did Al Sharbi engage in any criminal or terrorist conduct. Nor did he kill, injure, fire upon, or direct fire upon, any U.S. or Coalition Forces. Nor did he attempt any such conduct. He did not at any time commit any criminal violations, or any violations of the law of war. Nor did he ever enter into any agreement with anyone to do so. Accordingly, Al Sharbi brings this action seeking a writ of *habeas corpus* to secure his release from Respondents' unlawful detention.

4.      Lacking any lawful basis for Al Sharbi's continued detention, Respondents now seek to justify Al Sharbi's detention by subjecting him to "trial" by military commission (the "Commission") on purported war crime charges of Respondents' own creation and definition, never before recognized under international law, and procedures that are unannounced and unpromulgated in advance, procedures essentially subject to the ongoing judgment of the Commission, freely subject to modification by the Commission as its proceedings take place.

Because Respondents' war crimes charges are indisputably invalid and the Commission's process and procedures unlawful, Al Sharbi seeks habeas relief with respect to his unlawful detention and trial by the Commission. A true copy of the charges proffered against Al Sharbi for trial by the Commission is attached as EXHIBIT A.

5.      As set forth more fully below, Al Sharbi also challenges numerous other unlawful aspects of his continued detention by Respondents, including, without limitation (i) Respondents' failure to afford Al Sharbi the protections of the Geneva Conventions and other applicable law to which he is presumptively and actually entitled, (ii) Respondents' denial of Al Sharbi's rights to due process and equal protection of the laws, and (iii) Al Sharbi's continued detention in derogation of his right to speedy trial under applicable law.

6.      Last year, the Supreme Court explained that "[c]onsistent with the historic purpose of the writ, this Court has recognized the federal courts' power to review applications for habeas relief in a wide variety of cases involving Executive detention, in wartime as well as in times of peace." *Rasul v. Bush*, 542 U.S. 466 at 557, 124 S. Ct. 2686 at 2692-93 (2004).

7.      This is one such application. Al Sharbi invokes the protection of this Court and seeks the Great Writ in order to secure his release and to vindicate the fundamental rights recognized by the Supreme Court. *See Hamdi v. Rumsfeld,* 542 U.S. 507, 124 S. Ct. 2633 (2004); 28 U.S.C. § 2241(c)(3); *Rasul*, 542 U.S. 446 at 487, 124 S. Ct. 2686 at 2700 (Kennedy, J., concurring) ("[a] necessary corollary of [*Johnson v.*] *Eisentrager* [339 U.S. 763 (1950)] is that there are circumstances in which the courts maintain the power and the responsibility to protect persons from unlawful detention even where military affairs are implicated"), citing *Ex parte Milligan*, 4 Wall. 2, 18 L.Ed. 281 (1866).

**PARTIES**

3

8.    Petitioner Ghassan Abdullah Al Sharbi, is a citizen of Saudi Arabia. The United States military (or its agents) assumed custody of Al Sharbi in or about March 2002, and he has remained in the custody of the United States continuously since that date.

9.    Respondent George W. Bush is President of the United States, and executed the Military Order that created the military commissions under which Al Sharbi is being detained. Respondent President Bush also designated Al Sharbi a person eligible for trial by the Commission, which is why Al Sharbi is scheduled for an unlawful trial before the Commission.

10.    Respondent Donald H. Rumsfeld is the Secretary of Defense of the United States, and commands all aspects of the United States Military, including the Office of Military Commissions established by the applicable Presidential Military Order. Respondent Secretary Rumsfeld has custodial authority over Al Sharbi and is ultimately in charge of the prosecution of Al Sharbi by the Commission.

11.    Respondent Gordon R. England is Secretary of the Navy, and is Respondent Secretary Rumsfeld's designee for the Combatant Status Review Tribunals.

12.    Respondent John D. Altenburg, Jr., is the Appointing Authority for Military Commissions, and in that capacity exercises authority over the entire Commission process.

13.    Respondent Brigadier General Jay Hood is the Commander of Joint Task Force Guantánamo and, in that capacity, is responsible for Al Sharbi's continued and indefinite detention at Guantánamo Bay.

14.    Colonel Michael Bumgarner is the Commander of Joint Detention Group and in that capacity, is responsible for the U.S. facility where Al Sharbi is presently detained. He exercises immediate custody over Al Sharbi pursuant to orders issued by Respondent President Bush, Respondent Secretary Rumsfeld and Respondent General Hood.

4

## JURISDICTION

15.     This action arises under the Constitution, laws and treaties of the United States, including Articles I, II, III, and VI and the 5th and 6th Amendments, 28 U.S.C. §§1331, 1350, 1361, 1391, 2241, and 2242, 5 U.S.C. §702, the All Writs Act (28 U.S.C. §1651), 42 U.S.C. §1981, the *Bivens* doctrine [*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971)], and Geneva Convention (III), as well as international law more generally.

16.     This Court possesses subject matter jurisdiction under 28 U.S.C. §§ 1350, 1361 and 1391, 5 U.S.C. § 702, as well as the *habeas corpus* statute, 28 U.S.C. § 2241, and the All Writs Act, 28 U.S.C. § 1651. In addition, the Court may grant the relief requested under Art. 2(a)(12) of the UCMJ, 10 U.S.C. § 802(a)(12), which grants jurisdiction over a petition for judicial review filed by or on behalf of parties incarcerated at Guantánamo. As explained above, the Supreme Court expressly held that this Court has subject matter jurisdiction to consider a *habeas* petition by a Guantanamo detainee in *Rasul*.

17.     This Court has personal jurisdiction over the parties. Respondents have substantial contacts in this District.

18.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (e) since a substantial part of the events, acts, and omissions giving rise to the claim occurred in this District and a Respondent may be found in the District. *See Rasul*, 542 U.S. 466, 124 S. Ct. 2686 (2004); *see also Gherebi v. Bush*, 374 F.3d 727 (9th Cir. 2004) (amended opinion) (transferring Guantánamo Bay detainee's action to the District of the District of Columbia in light of *Rumsfeld v. Padilla*, 542 U.S. 426, 124 S. Ct. 2711 (2004)).

## ALLEGATIONS COMMON TO ALL COUNTS

19.    Following the September 11, 2001 attack upon targets in the United States, the United States commenced military operations in Afghanistan on or about October 7, 2001 against Taliban and "*al Qa`ida*" targets within Afghanistan. That activity was augmented twelve days later on October 19, 2001, with ground operations by U.S. forces. Through December 2001, the U.S. military action initially involved a small number of Special Forces operating on the ground in Afghanistan, working with forces of the Northern Alliance, a consortium of armed and organized Afghan foes of the Taliban government. A substantial air campaign supported these units as well as a small number of Special Forces from other nations (hereinafter collectively the "Coalition Forces"). The Northern Alliance and Coalition Forces operated in full cooperation and coordination in their joint campaign against the Taliban and *al Qa`ida*.

20.    The above military activities were authorized by Congress in a "use of force" resolution passed on September 18, 2001:

> [t]hat the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

*See* Authorization for Use of Military Force (hereinafter the "AUMF"), Pub.L. 107-40, 115 Stat. 224 (2001). *See also Rasul*, 542 U.S. at 470, 124 S. Ct. at 2690 ("[a]cting pursuant to that authorization, the President sent U.S. Armed Forces into Afghanistan to wage a military campaign against *al Qa`ida* and the Taliban regime that had supported it").

21.    Pursuant to the AUMF, the United States, in support of, and in conjunction with, the Northern Alliance, commenced military action against Afghanistan's Taliban government. Within ninety days, the Taliban government was defeated and Coalition Forces and the Northern Alliance had captured and/or apprehended a number of persons allegedly associated with the

6

Taliban and/or *al Qa`ida*. These operations extended to cooperative efforts with the Government of Pakistan to seize individuals suspected of supporting Taliban and/or *al Qa`ida* efforts in Afghanistan. Upon information and belief, Petitioner was seized in Pakistan in or about March 2002.

22.     Upon information and belief, on July 6, 2004, Respondent President Bush designated Al Sharbi as a person eligible for trial before the Commission. The Commission was established by Presidential Military Order, dated November 13, 2001, *see* 66 Fed. Reg. 57,833 (November 13, 2001) (hereinafter "PMO"), and the March 21, 2002, Military Commission Order No. 1 (hereinafter "MCO No. 1"), subsequently revised and re-issued on August 31, 2005 (A copy of the PMO is attached hereto as EXHIBIT B; a copy of revised MCO No. 1 is attached hereto as EXHIBIT C.)

23.     On November 9, 2005, over a year after Al Sharbi was designated a person eligible for trial, charges against him were publicly released.     They were approved by Respondent Altenburg on November 4, 2005. The charges allege one offense: Conspiracy. *See United States v. Ghassan Abdullah Al Sharbi,* Charge Sheet (attached hereto as EXHIBIT A).

24.     Some of the procedures for the military commissions under which Al Sharbi will be tried were set up in the MCO No. 1 (see EXHIBIT C). Many other procedures, fundamental to accepted concepts of due process and procedural fairness will be made up as the proceedings go along, precluding the accused from having any practical understanding of the procedures under which he will be tried.

25.     Even those procedures that have been clearly established are deficient and will not result in a full and fair trial. Under these existing procedures, Respondent Secretary Rumsfeld has appointed an "Appointing Authority," Respondent Altenburg, a retired Army officer who is

7

currently employed by the Department of Defense in a civilian capacity.  The Appointing Authority will in turn appoint members of the Commission.  Thus, Respondent Secretary Rumsfeld and his appointee, who are investigating and prosecuting Al Sharbi, will ultimately be responsible for choosing the panel that will judge him.  *Id.* at ¶ 6.  This violates the principle established and universally accepted by civilized nations that no one should be a judge in his own cause.  *See Federalist Papers #10 (James Madison)*: "No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity."

26.     During the military commission proceedings, there is no bar to admission of evidence that courts normally deem unreliable -- such as statements coerced from Al Sharbi at a time when he had no counsel, or statements coerced from other detainees.  Indeed, witness statements can be used even if the witnesses are not available to testify and their testimony is presented as unsworn hearsay.

27.     There will be no direct appeal from a decision of the Commission.  *Id.* The proceedings will be reviewed, but not in federal court.  The "review" provided by the PMO and MCO 1 is to take place entirely within the Executive Branch, by officials appointed by the very officials accusing Al Sharbi of criminal misconduct.  Thus, not only has Al Sharbi been held without trial for over three years, there is no future prospect of a trial by an impartial tribunal based upon reliable evidence.

28.     Just as there has not been and will not be an unbiased determination that Al Sharbi is guilty of any crimes, there also has been no determination by a neutral tribunal that Al Sharbi can justifiably be held as an enemy combatant.  On June 28, 2004, the United States Supreme Court decided *Hamdi,* 542 U.S. 507, 124 S. Ct. 2633 (2004), in which it determined

8

that individuals could not be detained as enemy combatants unless such a determination was made by a neutral tribunal that accorded them due process.

29. Subsequently, the United States created a Combatant Status Review Tribunal ("CSRT") to make determinations as to whether those held were enemy combatants. The CSRT was hastily formed in the wake of the Supreme Court's decisions in *Rasul* and *Hamdi*, and does not qualify as the neutral tribunal that satisfies the requirements of due process. For example, the CSRT fails even to meet the standards for Article 5 hearings as set forth in U.S. Army regulations.[1]

30. The CSRT varies from both the Army regulations and *Hamdi* (and due process generally) materially and dispositively, including with respect to, *inter alia*: (1) the standard of proof required [Regulation 190-8, §1-6(e)(9)'s preponderance of the evidence standard as opposed to the CSRT's "rebuttable presumption" that the detainee is an enemy combatant][2]; (2) the availability of an appeal by the government of a ruling favorable to the detainee; (3) the categories in which a detainee may be placed (*i.e.*, the CSRT fails to allow for prisoner of war (POW) status, but instead purport to determine only whether or not a detainee is an "enemy combatant"); (4) the detainee's right to counsel and/or representation by a personal representative of choice before the Tribunal; (5) whether the hearings are open to the public; (6) the government's reserved power to rescind or change the conditions of the Tribunals at its whim;

---

[1]    *See* Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, Army Regulation 190-8, §1-6 (1997).

[2]    Indeed, the Order implementing the Combatant Status Review Tribunals informs tribunal members that the detainee's status has already been predetermined by their superiors: "[e]ach detainee subject to this Order has been determined to be an enemy combatant through multiple levels of review by officers of the Department of Defense." *See* Dep't of Defense Order No. 651-04, (July 07, 2004), *available at* http://www.defenselink.mil/releases/2004/nr20040707-0992.html (accessed December 6, 2005 and attached hereto as EXHIBIT D).

(7) the composition of the Tribunal(s) (in contrast with *Hamdi's* requirement of "neutral decisionmaker[s,]" 542 U.S. at 533, 124 S. Ct. at 2648); and (8) even the definition of "enemy combatant." These deficiencies are individually and collectively fatal to the CSRT.

## CLAIMS FOR RELIEF

### COUNT ONE

### RESPONDENTS MAY NOT DETAIN AL SHARBI FOR TRIAL BEFORE AN INVALIDLY CONSTITUTED MILITARY COMMISSION

31.     Al Sharbi re-alleges and incorporates by reference paragraphs 1 through 30 above.

32.     The Commission in this case is invalid and improperly constituted, and the grant of subject matter jurisdiction to the Commission is overbroad and unlawful for at least the following reasons:

### A.     The Commission lacks jurisdiction because the President lacked congressional authorization to establish the Commission

33.     The Supreme Court has noted that "[w]hen the President acts in absence of . . . a congressional grant . . . of authority, he can only rely upon his own independent powers." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 72 S. Ct. 863, 872 (1952) (Jackson, J. concurring). *See also Hamdi v. Rumsfeld*, 542 U.S. 507, 124 S. Ct. 2633 (2004). The Constitution expressly grants Congress the sole power to create military commissions and define offenses to be tried by them. The Constitution vests Congress, not the Executive, with "All legislative powers," with the power "[t]o define and punish offences against the Law of Nations" and "[t]o constitute Tribunals inferior to the Supreme Court." U.S. Const., Art. I § 8, cl. 9, cl. 10.

34.     Congress has not authorized the establishment of military commissions to try individuals captured during the Afghanistan war. Accordingly, Respondents' detention of Al Sharbi for trial by the Commission is improper, unlawful and invalid as an *ultra vires* exercise of

authority. It exceeds the President's powers under Article II and thus violates the constitutional principles of separation of powers.

35.    Al Sharbi's status as a Saudi citizen does not confer unlimited power on Respondents to operate outside of the Constitutional framework. The Supreme Court's assertion of jurisdiction for the federal courts in *Rasul* establishes indisputably that aliens held at the base in Guantánamo Bay, no less than American citizens, are entitled to invoke the federal courts' authority under 28 U.S.C. § 2241. *Rasul,* 542 U.S. at 561, 124 S. Ct. at 2696 ("[c]onsidering that the statute draws no distinction between Americans and aliens held in federal custody, there is little reason to think that Congress intended the geographical coverage of the statute to vary depending on the detainee's citizenship") (footnote omitted). Thus, both Congress and the judiciary possess constitutional authority to check and balance the power of the Executive to act unilaterally. *Rasul*, 542 U.S. at 487, 124 S. Ct. at 2700 (Kennedy, J., concurring).

**B.     The Appointing Authority lacks power to exercise military authority to appoint a military commission.**

36.    Because there is no statute expressly stating who can appoint members of a Commission, the power to appoint members of a military commission is based upon the power to convene a general court-martial. Only the Executive, the Secretary of Defense (or Secretaries of the other branches of the armed forces) or a commanding officer to whom the Secretary has delegated authority may convene a general court-martial. *See* 10 U.S.C. § 822.

37.    In this case, the Respondent, Secretary Rumsfeld purportedly has delegated authority to Respondent Altenburg to appoint the members of military commissions.

38.    Respondent Altenburg is a civilian, not a commissioned officer, and thus lacks the power to exercise military jurisdiction in any form.

11

39.     As a result, the Commission by which the Respondents intend to try Al Sharbi is improperly constituted and invalid, such that Al Sharbi is entitled to a writ of *habeas corpus* preventing his unlawful detention and trial before that improper tribunal.

### C.     The Commission lacks jurisdiction to try individuals at Guantánamo Bay.

40.     Military commissions have no jurisdiction to try individuals far from the "locality of actual war." *See Milligan*, 71 U.S. at 127.

41.     The Commission that will try Al Sharbi is situated far outside any zone of conflict or occupation, and Al Sharbi's alleged conduct on which the charges are based did not occur at Guantánamo Bay. As such, the Commission lacks authority to try Al Sharbi, and therefore, the Respondents lack the authority to continue to detain Al Sharbi for any purported trial at Guantánamo Bay.

### COUNT TWO

**RESPONDENTS MAY
NOT DETAIN AL SHARBI FOR OFFENSES THAT HAVE
BEEN CREATED BY THE PRESIDENT AFTER THE FACT**

42.     Al Sharbi alleges and incorporates by reference paragraphs 1 through 41 above.

43.     Respondent President Bush is attempting to try Al Sharbi for crimes that he created long after the alleged "offenses" were committed.

44.     The offense alleged against Al Sharbi, "conspiracy," did not previously exist as an offense under the law of war. This offense and others were in effect created by the PMO, MCO No. 1, and Military Commission Instruction No. 2 (attached hereto as EXHIBIT E), well after they were allegedly committed by Al Sharbi. In essence, the government alleges that Al Sharbi is *criminally* liable for allegedly participating in combat against the United States and its allies. That has never been a criminal offense. Thus, proceeding against Al Sharbi before the Military

Commission violates the principle established and universally accepted among civilized nations: *nulla poena sine lege* (no punishment without a [preëxisting] law).

### A.    The Executive cannot define crimes.

45.    Congress, not the Executive, has the authority to legislate under Article I of the Constitution. This expressly includes the power "[t]o define and punish . . . Offences against the Law of Nations." Absent Congressional authorization, the Executive lacks the power to define specific offenses. If he attempts to do so, as he has done here, his actions are *ultra vires* and violate the principles of separation of powers. Accordingly, Al Sharbi may not be detained for trial on newly-created offenses established and defined solely by the President.

### B.    Crimes cannot be defined after the fact.

46.    In addition, any charges instituted by the Commission must constitute offenses under the law of war as it existed at the time the alleged conduct was committed. Applying laws created after the conduct (such as the definition of offenses set forth in Military Commission Instruction No. 2 (MCI No. 2) and those which have been included in the Charges against Al Sharbi would violate the *ex post facto* clause of the Constitution (Art. 1, §9, cl. 3), the principle that a person must have reasonable notice of the bounds of an offense, and the principle *nulla poena sine lege* cited above (¶ 44). Offenses defined to criminalize the conduct of a single person or group of people -- such as those in MCI No. 2 also violate the Constitutional prohibition on bills of attainder.

47.    Since the Charges do not allege any offenses against Al Sharbi under the law of war as it existed at the time he allegedly committed these acts, Al Sharbi cannot be detained as a result of these Charges. Accordingly, Al Sharbi is entitled to a writ of *habeas corpus*, and Al Sharbi should be released immediately.

## COUNT THREE

### RESPONDENTS MAY
### NOT DETAIN AL SHARBI FOR TRIAL ON CHARGES
### OUTSIDE THE JURISDICTION OF THE MILITARY COMMISSION

48.     Al Sharbi re-alleges and incorporates by reference paragraphs 1 through 57 above.

49.     Al Sharbi's confinement is unlawful because he is being detained to face charges before a commission that is not empowered to hear and/or adjudicate the charges instituted against him. Al Sharbi's continued detention purportedly to face trial on the charges leveled against him is unlawful because the charges are outside the parameters established by the Uniform Code of Military Justice (hereinafter "UCMJ"), 10 U.S.C. §801, *et seq.*, the statutory scheme that controls military detentions and that limits the offenses triable by military commissions (even in instances where Congress has provided any jurisdiction to the military commissions, which it has not with respect to the conflict in Afghanistan).

50.     Under the UCMJ, military commissions may not hear and adjudicate any offenses other than those that are recognized by the traditional law of war or those that Congress has expressly authorized them to hear. Here, the offenses charged are not within either of these categories.

51.     The purported offense of conspiracy is not a valid offense triable by the Commission under recognized principles of the law of war, the UCMJ or any other statutory authorization. Because civil law countries do not recognize a crime of conspiracy, conspiracy has never been part of the laws of war. No international criminal convention has ever recognized conspiracy to violate the laws of war as a crime. This includes the Geneva Conventions, as well as those establishing the international criminal tribunals for the former Yugoslavia and Rwanda, as well as the International Criminal Court. Indeed, the government is creating charges that have

14

been specifically rejected as violations of the laws of war -- including at Nuremburg, for example.

52.    The purported offense of attempted murder by an unprivileged belligerent, which Al Sharbi allegedly "conspired" to commit, also is not a valid offense triable by the Commission under recognized principles of the law of war, the UCMJ or any other statutory authorization. Once again such an offense has not been recognized in any of the conventions setting forth substantive violations of the laws of war. Nor does it have any other source in the law of war. Such an offense would criminalize participation in war, which is not the intent of the laws of war.

53.    The offenses proffered against Al Sharbi before the Military Commission relate to acts allegedly done before any arguable state of war existed between the United States and any national or other entity. Thus, the acts charged are not within the jurisdiction of the Military Commission or otherwise within the law of armed conflict.

54.    As a plurality of the Supreme Court held in *Reid v. Covert*:

> [t]he jurisdiction of military tribunals is a very limited and extraordinary jurisdiction derived from the cryptic language in Art. I, § 8 [granting Congress the power to "define and punish . . . Offences against the Law of Nations"], and, at most, was intended to be only a narrow exception to the normal and preferred method of trial in courts of law. Every extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts, and, more important, acts as a deprivation of the right to jury trial and of other treasured constitutional protections.

354 U.S. 1, 21, 77 S. Ct. 1222, 1233 (1957).

55.    Because the charges do not allege any offenses against Al Sharbi under the law of war or express statutory authority, the Commission lacks jurisdiction to try and/or punish Al Sharbi for those offenses. Accordingly, Al Sharbi is entitled to a writ of *habeas corpus*, and should be released immediately.

**COUNT FOUR**

**THE MILITARY COMMISSION
PROCEDURES VIOLATE AL SHARBI'S RIGHTS UNDER
STATUTORY, CONSTITUTIONAL, AND INTERNATIONAL LAW**

56.    Al Sharbi re-alleges and incorporates by reference paragraphs 1 through 54 above.

57.    Even if the Commission had jurisdiction, Al Sharbi's detention to stand trial before the Commission would remain unlawful because the Commission's procedures violate applicable principles of statutory, constitutional, and international law.

58.    In a series of "Military Commission Instructions" (the "MCIs"), Respondent Secretary Rumsfeld prescribed the procedural rules of these special military commissions. If Al Sharbi is tried according to these proposed procedures, he will receive less protection than he is entitled to under United States law, the Constitution, and international law and treaties. The procedures set forth by the MCIs provide Al Sharbi with far less protection than those set forth in the UCMJ. The MCIs violate Al Sharbi's rights to certain basic procedural safeguards. The MCIs fail to provide Al Sharbi an impartial tribunal to adjudicate the charges against him or review those charges. Al Sharbi's accusers effectively appoint the "judge and jury" and then review their decision. And during these proceedings themselves, his accusers can introduce unreliable evidence of the worst sort -- unsworn allegations derived from coerced confessions with no right of confrontation.

59.    The absence of procedural protections makes the Commission inadequate as a matter of law.

**A.    The UCMJ**

60.    Al Sharbi is entitled to the protections of the basic trial rights set forth by Congress in the UCMJ. By its own terms, the UCMJ applies to all persons, including Al Sharbi,

16

who are detained within the territory or leased properties of the United States. And the UCMJ prohibits biased tribunals and the use of unreliable evidence of the sort the commissions intend to permit.

### B.    The Geneva Convention

61.    The Geneva Convention requires that prisoners of war ("POW"s), as defined by the Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, be treated with the same procedural protections as the soldiers of the country detaining them.[3] Under Article 5 of the Geneva Convention (III) ("Article 5"), Al Sharbi is entitled to be treated as a POW until a competent tribunal has determined otherwise.[4] As a result, he is entitled to the procedural protections that would apply in a court martial.

62.    Even if Al Sharbi were not a prisoner of war, any proceeding would still have to meet the requirements of Common Article III of the Geneva Convention. These provide that conviction can only be pronounced by an impartial court respecting generally recognized principles of judicial procedure. These requirements are not met by the Commission.

### C.    The Due Process Clause

63.    The Constitution's guarantee of due process also guarantees Al Sharbi the basic trial rights he will be denied before the Commission. A trial without these basic procedural safeguards lacks the fundamental fairness required in any judicial proceedings -- especially in criminal proceedings that can result in life imprisonment.

64.    Since the Commission procedures violate statutory, constitutional, and international law, and in so doing, fail to provide Al Sharbi with the basic safeguards necessary

---

[3]    Geneva Convention (III) Relative to the Treatment of Prisoners of War: August 12, 1949, 75 U.N.T.S. 135, *entered into force* Oct. 21, 1950. The Geneva Convention has also been codified in the UCMJ.

[4]    *See id.* at Art. 5.

to constitute a fundamentally fair criminal proceedings, Al Sharbi is entitled to a writ of *habeas corpus* holding these proceedings to be illegitimate, and should be released immediately.

**COUNT FIVE**

**TRIAL BEFORE THE COMMISSION
VIOLATES AL SHARBI'S RIGHT TO
EQUAL PROTECTION OF THE LAWS OF THE UNITED STATES**

65.     Al Sharbi re-alleges and incorporates by reference paragraphs 1 through 63 above.

**A.     Al Sharbi's detention violates the Equal Protection Clause.**

66.     Al Sharbi is being detained by Respondents under the claimed authority of the PMO and MCO No. 1. These Orders violate Al Sharbi's right to equal protection of the laws of the United States. Under the PMO and MCO No. 1, Al Sharbi may be held for trial by the Commission only because of his alienage, since the Orders, by their terms, apply *only* to *non*-citizens. [5] Consequently, this detention runs afoul of the very purpose of the Equal Protection Clause of the United States Constitution.

67.     The Supreme Court has held that any discrimination against aliens not involving governmental employees is subject to strict scrutiny. Here, the government cannot show a compelling governmental reason, advanced through the least restrictive means, for granting *citizens* access to the fundamental protections of civilian justice (including, *inter alia*, indictment, evidentiary rules ensuring reliability and fairness, a system consistent with previously prescribed rules developed by the legislature and enforced by impartial courts, a jury trial presided over by an independent judge not answerable to the prosecutor, and the right to an appeal before a tribunal independent of the prosecuting authority), but affording *non-citizens* a

---

[5]     Military Order of November 13, 2001 Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833, § 4 (November 13, 2001); Presidential Military Order, 66 Fed. Reg. 57,833 (Nov. 13, 2001) (EXHIBIT B).

distinctly less protective and inferior brand of adjudication. While the government may have latitude in differentiating between citizens and aliens in areas such as immigration, it has no such latitude with respect to criminal prosecutions.

68.    Thus, the blatant and purposeful discriminatory nature and impact of MCO No. 1 violates the Equal Protection clause.

### B.    Al Sharbi's detention violates 42 U.S.C. § 1981.

69.    Al Sharbi's detention for trial by the Commission also violates 42 U.S.C. § 1981.[6] That fundamental statutory provision guarantees equal rights for all persons to give evidence, to receive equal benefit of all laws and proceedings for the security of persons, and to receive like punishment. Al Sharbi is being unlawfully detained for purposes of trial by the Commission solely because he is a non-citizen. A citizen who committed the very same acts as Al Sharbi could not be detained under the PMO and held for trial before the Commission. Accordingly, Al Sharbi's detention for trial by the Commission on that discriminatory basis is unlawful.

70.    Respondents have detained Al Sharbi for trial before the Commission in violation of equal protection of the laws of the United States.

71.    Accordingly, Al Sharbi is entitled to a writ of habeas corpus, a determination that the Commission proceedings against him are unlawful, and he should be released immediately.

### COUNT SIX

### RESPONDENTS FAIL TO
### JUSTIFY HOLDING AL SHARBI AS AN ENEMY COMBATANT

---

[6]    42 U.S.C. §1981(a) states in its entirety:
[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

72.    Al Sharbi re-alleges and incorporates by reference paragraphs 1 through 70 above.

73.    Just as the government has no authority to detain Al Sharbi for his alleged violations under a nonexistent version of the law of war, the government has no authority to detain Al Sharbi as an enemy combatant.    Respondents' actions to date in detaining Al Sharbi constitute a violation of the process accorded persons seized by the military in times of armed conflict as defined by Geneva Conventions III and IV and customary international law, as well as being inconsistent with the provisions set forth below.

### A.    Under *Hamdi*, the Due Process Clause requires a neutral tribunal with significant procedural protections to determine whether Al Sharbi is an enemy combatant.

74.    The CSRT process and procedures that have now been established violate due process at least with respect to:  (1) the failure to adhere to an appropriate standard of proof; (2) the granting of an appeal to the government of a determination favorable to the detainee; (3) the failure to make an appropriate status determination by limiting the inquiry to consideration only of "enemy combatant" status; (4) the denial of a detainee's right to counsel or other appropriate representation; (5) the denial of a public hearing; (6) the government's power to arbitrarily rescind or change the CSRT process and procedures; and (7) the failure to constitute the CSRT in a manner to assure a neutral decision maker.

### B.    The Geneva Convention and army regulations require a determination by a fair tribunal.

75.    Under Article 5 of the Geneva Convention, Al Sharbi is entitled to a "competent tribunal" to determine whether he can be held as an enemy combatant.[7]  The same procedural deficiencies that render the CSRT proceedings inadequate for purposes of due process also

---

[7]    *See id* at Art. 5

render the CSRT deficient as a competent tribunal. Army Regulations 190-8 and the Administrative Procedures Act also show these procedures are unlawful as, for example, the burden of proof is not consistent with that established in the regulations.

76.     Moreover, it is now too late to establish a competent tribunal. Article 5 of Geneva Convention III, provides that "should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy belong to any of the categories enumerated in [Article 4 of the Geneva Convention (III), defining the different categories of belligerents,] such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal."[8]

77.     Respondents have unlawfully detained Al Sharbi in violation of their obligation to treat Al Sharbi presumptively as a POW, as required by Article 5, and in violation of the procedural requirements of the Third and Fourth Geneva Conventions and customary international law more generally. Thus, the government's failure to accord Petitioner Al Sharbi the protections of Article 5 violates the provisions of Geneva Convention (III) as well as the U.S. military regulations promulgated to implement them.

C.     **The government cannot continue to hold Al Sharbi under its own regulations**

---

[8]     *Id* at Art. 5. Geneva Convention (III) revised the Geneva Convention relative to the Treatment of Prisoner of War of July 27, 1929, which followed the 18 October 1907 Hague Conventions [Relative to the Opening of Hostilities (III), Respecting the Laws and Customs of War on Land and its annex: Regulation concerning the Laws and Customs of War on Land (IV), and Respecting the Rights and Duties of Neutral Powers and Persons in Case of War on Land (V)] , and was enacted concurrent with the Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces In the Field, Geneva, 12 August 1949 ["Geneva Convention (I)"], the Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Geneva, 12 August 1949 ["Geneva Convention (II)"], Convention relative to the Protection of Civilian Persons in Time of War, Geneva, 12 August 1949 ["Geneva Convention (IV)"]. Subsequently, two Protocols Additional to the Geneva Conventions of 12 August 1949, relating to the Protection of Victims of International Armed Conflicts ("Protocol I"), 8 June 1977, and relating to the Protection of Victims of Non-International. Armed Conflicts ("Protocol II"), 8 June 1977. The United States is not a signatory to Protocol I, but Australia and many other nations are.

21

78.    Indeed, even under the Army's own Regulations 190-8 at 1-6(g), "Persons who have been determined not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed."[9]

79.    By arbitrarily and capriciously detaining Petitioner in custody for over three years while claiming he is not entitled to prisoner of war status, Respondents have acted and continue to act *ultra vires* and in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2). Under the Army's own regulations, Petitioner cannot be held unless he has committed specific acts under which he can be punished. But as alleged in the Counts on the Commission, the government has not charged Petitioner with any acts that could form a basis to hold him.

### E.    Under the Alien Tort Claims Act, Respondents Cannot Continue to Detain Petitioner Al Sharbi.

80.    By arbitrarily holding Petitioner without any justification for doing so and subjecting him to cruel, inhuman or degrading treatment, including torture, Respondents have acted in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350 in that the acts violated customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

### F.    The government cannot continue to hold Al Sharbi as an enemy combatant once hostilities have ended.

81.    Under Article 118 of Geneva Convention (III), "[p]risoners of war shall be released and repatriated without delay after the cessation of active hostilities." *See also Hamdi,*

---

[9]    *See* Army Regulation 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, § . 1-6(g), (1997)

542 U.S. at 520, 124 S. Ct. at 2641. Respondents and their agents have acknowledged that hostilities in Afghanistan have ceased or will soon cease (even if they were ongoing to some extent until shortly before the Supreme Court's decision in *Hamdi*). Similarly, Respondent Secretary Rumsfeld, in a joint May 1, 2003 press conference with Afghan President Hamid Karzai in Washington, announced that "we're at a point where we clearly have moved from major combat activity to a period of stability and stabilization and reconstruction activities. The bulk of this country today is permissive, it's secure."[10]

82.    Al Sharbi is presumptively a POW entitled to all protections afforded by Geneva Convention (III), including, under Article 118, release after hostilities have ceased.

83.    Al Sharbi also is entitled to the protection of Common Article 3 of Geneva Convention (III). Article 3(1)(d) prohibits the contracting parties from "passing . . . sentences . . . without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples."

84.    In this case, the prolonged confinement of Al Sharbi without charge, and without process to contest his guilt or challenge his detention, amounts to an arbitrary and illegally imposed sentence that is incompatible with fundamental guarantees of due process recognized by all civilized people, in violation of Article 3 of the Geneva Convention (III), and in violation of the due process clause of the Fifth Amendment. Further, Respondents' confinement of Al Sharbi is a form of punishment in violation of the 8th Amendment to the Constitution. Accordingly, Al Sharbi is entitled to a writ of habeas corpus and should be released immediately.

---

[10]    *See CNN Rumsfeld   Major combat over in Afghanistan* (May 1, 2003) *at* http://www.cnn.com/2003/WORLD/asiapcf/central/05/01/afghan.combat (accessed December 6, 2005); *See also* Armed Forces Information Service, *News Articles,* (May 1, 2003) *at* http://www.defenselink.mil/news/May2003/n05012003_200305016.html (accessed December 6, 2005).

## COUNT SEVEN

### RESPONDENTS HAVE DENIED
### AL SHARBI THE RIGHT TO A SPEEDY TRIAL AND THE RIGHT
### TO BE FREE FROM UNREASONABLE PRE-TRIAL CONFINEMENT

85.    Al Sharbi re-alleges and incorporates by reference paragraphs 1 though 83 above.

### A.    Al Sharbi was entitled to a speedy trial under the UCMJ.

86.    The PMO, pursuant to which Al Sharbi has been detained for trial, purports to be based, in part, on congressional authorization embodied in selected provisions of the UCMJ.  In promulgating the PMO, Respondent President Bush relied, in part, on his authority under 10 U.S.C. §836, which allows the Executive to prescribe rules for military commissions so long as they are not inconsistent with the UCMJ.

87.    However, the PMO, and its implementation through MCO No. 1, clearly contravene Article 10 of the UCMJ, 10 U.S.C. §810, which provides that any arrest or confinement of an accused must be terminated unless charges are instituted promptly and made known to the accused, and speedy trial afforded for a determination of guilt on such charges:

> [w]hen any person subject to this chapter is placed in arrest or confinement prior to trial, immediate steps shall be taken to inform him of the specific wrong of which he is accused and to try him or dismiss the charges and release him.

10 U.S.C. § 810.

88.    Al Sharbi is a person subject to the UCMJ by virtue of Respondent President Bush's PMO and MCO No. 1, as well as by virtue of Article 2 of the UCMJ, 10 U.S.C. § 802(a)(12), which provides that "persons within an area leased by or otherwise reserved or acquired for the use of the United States" and under the control of any of the various branches of the military are subject to the UCMJ.  Under the Supreme Court's decision in *Rasul*, 542 U.S. at 480, 124 S. Ct. at 2696, Guantánamo Bay qualifies under both of these authorities.

24

89.    The type of delays to which Al Sharbi has been subjected are intolerable in the absence of extraordinary or compelling circumstances. Here, the Respondents have not provided any reason whatsoever for their inordinate delays in charging Al Sharbi. Since Respondents did not take "immediate steps . . . to inform" Al Sharbi "of the specific wrong of which he is accused," they now have a clear and nondiscretionary duty under the UCMJ to "release him" from his confinement.

**B.    Al Sharbi was entitled to a speedy trial under the Geneva Convention.**

90.    Al Sharbi's lengthy pre-trial confinement violates Article 103 of Geneva Convention (III), as well as United States government regulations.    Article 103 of Geneva Convention (III) provides that:

> [j]udicial investigations relating to a prisoner of war shall be conducted as rapidly as circumstances permit and so that his trial shall take place as soon as possible. A prisoner of war shall not be confined while awaiting trial unless a member of the armed forces of the Detaining Power would be so confined if he were accused of a similar offence, or if it is essential to do so in the interests of national security. *In no circumstances shall this confinement exceed three months.*

6 U.S.T. 3316, 3394, 75 U.N.T.S. 135 (emphasis added).

91.    In addition, Article 5 of Geneva Convention (III) declares that:

> should any doubt arise as to whether persons . . . belong to any of the categories [entitled to protection as a P.O.W. under the Convention], such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.

92.    Likewise, §1-6(a) U.S Army Regulation 190-8, entitled Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, requires that United States military forces abide by the provisions of Article 5 of Geneva Convention (III).    Similarly, the Commander's Handbook on the Law of Naval Operations states that "individuals captured as spies or as illegal combatants have the right to assert their claim of entitlement to prisoner-of-war

25

status before a judicial tribunal and to have the question adjudicated." Department of the Navy, NWP 1-14M, The Commander's Handbook on the Law of Naval Operations 11.7 (1995).

93.    Respondents are under a clear nondiscretionary duty under Geneva Convention (III), and under the U.S. Army's (and Navy's) own regulations to release Al Sharbi because he has been detained in segregation for more than three months.

94.    Even if Al Sharbi were not a presumptive POW, the Geneva Convention would not sanction such delay. The Geneva Convention requires that all civilians and protected persons must be "promptly informed" of the charges and brought to trial "as rapidly as possible." Geneva Convention IV, art. 7. Similarly the fundamental guarantees of Protocol I require that Al Sharbi be "informed without delay" of the particulars of charges, and incorporate the International Covenant on Civil and Political Rights.

### C.    Al Sharbi was entitled to a speedy trial under the Sixth Amendment.

95.    Moreover, the Sixth Amendment to the United States Constitution requires that in all criminal prosecutions, "the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. Respondents' unlawful detention violates Al Sharbi's right to a speedy trial.

96.    Respondents have denied Al Sharbi his right to a speedy trial as required by American law, the Constitution, and international law and treaty, and Al Sharbi therefore is entitled to a writ of *habeas corpus* and immediate release.

### PRAYER FOR RELIEF

WHEREFORE, Petitioner prays that this Court grant him the following relief:

1.    Issue the writ of mandamus or issue an Order directing Respondents to show cause why a writ of *habeas corpus* should not be granted and why Al Sharbi should not be immediately released;

2.    If an Order to Show Cause is issued, to include as part of the Order a prompt

schedule to receive briefing from the parties, including a factual return and a Response from Respondents, and a Reply from Petitioner, on the issues raised in this Petition, followed by a hearing before this Court on any contested factual or legal issues, and production of Petitioner Al Sharbi as appropriate;

3.    Issue an Order declaring unconstitutional and invalid and enjoining any and all Commission proceedings and/or findings against Petitioner Al Sharbi;

4.    Enter an Order declaring the Combatant Status Review Tribunal unconstitutional and invalid, and enjoin its operation with respect to Petitioner Al Sharbi; and

5.    Issue a writ of mandamus and an Order that orders Respondents not to use the PMO and/or the Military Commission Orders and Instructions to detain Al Sharbi, or adjudicate charges against Petitioner Al Sharbi, or conduct any proceedings related to such charges, because those Orders and instructions violate the U.S. Constitution, U.S. law, and U.S. treaty obligations, both facially and as applied to Petitioner Al Sharbi and are therefore *ultra vires* and illegal;

6.    After notice and hearing, determine and declare that Petitioner Al Sharbi's detention violates the Constitution, laws, treaties, and regulations of the United States; that the PMO is unconstitutional; that Al Sharbi has been denied a speedy trial; and that Respondents lack any jurisdiction over Petitioner Al Sharbi;

7.    After notice and hearing, issue a writ of mandamus that directs Respondents to obey their clear, nondiscretionary duty to follow the Constitution, laws, regulations, and treaties of the United States, and therefore to release Petitioner Al Sharbi immediately;

8.    Grant a writ of *habeas corpus* on behalf of Petitioner Al Sharbi ordering his immediate release;

9.    Enter an Order that the Court shall retain jurisdiction over this matter to permit

Petitioner Al Sharbi to respond to arguments advanced by Respondents on matters related to his continued detention;

      10.    Grant such other and further relief on behalf of Petitioner Al Sharbi and against Respondents as this Court deems just and proper.

Burlington, Vermont

December 13, 2005

                                          _____
                                        Robert D. Rachlin
                                        Downs Rachlin Martin PLLC
                                        PO Box 190
                                        199 Main Street
                                        Burlington, VT 05402-0190
                                        Tel : (802) 863-2375
                                        Fax:  (802) 863-2573
                                        rrachlin@drm.com

# EXHIBIT A

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| GHASSAN ABDULLAH AL SHARBI | ) **CHARGE:** |
| a/k/a Abdullah al Muslim | ) **CONSPIRACY** |
| a/k/a Abu Muslim | ) |

## JURISDICTION

1. Jurisdiction for this Military Commission is based on the President's determination of July 6, 2004 that Ghassan Abdullah al Sharbi (a/k/a/ Abdullah al Muslim a/k/a/ Abu Muslim hereinafter "al Sharbi") is subject to his Military Order of November 13, 2001.

2. The charged conduct alleged against al Sharbi is triable by a military commission.

## GENERAL ALLEGATIONS

3. Al Qaida ("the Base"), was founded by Usama bin Laden and others in or about 1989 for the purpose of opposing certain governments and officials with force and violence.

4. Usama bin Laden is recognized as the *emir* (prince or leader) of al Qaida.

5. A purpose or goal of al Qaida, as stated by Usama bin Laden and other al Qaida leaders, is to support violent attacks against property and nationals (both military and civilian) of the United States and other countries for the purpose of, *inter alia*, forcing the United States to withdraw its forces from the Arabian Peninsula and in retaliation for U.S. support of Israel.

6. Al Qaida operations and activities are directed by a *shura* (consultation) council composed of committees, including: political committee; military committee; security committee; finance committee; media committee; and religious/legal committee.

7. Between 1989 and 2001, al Qaida established training camps, guest houses, and business operations in Afghanistan, Pakistan, and other countries for the purpose of training and supporting violent attacks against property and nationals (both military and civilian) of the United States and other countries.

8. In 1992 and 1993, al Qaida supported violent opposition of US. property and nationals by, among other things, transporting personnel, weapons, explosives, and ammunition to Yemen, Saudi Arabia, Somalia, and other countries.

9. In August 1996, Usama bin Laden issued a public *"Declaration of Jihad Against the Americans,"* in which he called for the murder of U.S. military personnel serving on the Arabian peninsula.

10. In February 1998, Usama bin Laden, Ayman al Zawahiri, and others, under the banner of "International Islamic Front for Fighting Jews and Crusaders," issued a *fatwa* (purported religious ruling) requiring all Muslims able to do so to kill Americans – whether civilian or military – anywhere they can be found and to "plunder their money."

11. On or about May 29, 1998, Usama bin Laden issued a statement entitled "The Nuclear Bomb of Islam," under the banner of the "International Islamic Front for Fighting Jews and Crusaders," in which he stated that "it is the duty of the Muslims to prepare as much force as possible to terrorize the enemies of God."

12. Since 1989 members and associates of al Qaida, known and unknown, have carried out numerous terrorist attacks, including, but not limited to: the attacks against the American Embassies in Kenya and Tanzania in August 1998; the attack against the *USS COLE* in October 2000; and the attacks on the United States on September 11, 2001.

## CHARGE: CONSPIRACY

13. Sufyian Barhoumi, Jabran Said bin al Qahtani, and Ghassan al Sharbi in the United States, Afghanistan, Pakistan, and other countries, from on or about January 1996 to on or about March 2002, willfully and knowingly joined an enterprise of persons who shared a common criminal purpose and conspired and agreed with Usama bin Laden (a/k/a Abu Abdullah), Saif al Adel, Dr. Ayman al Zawahiri (a/k/a "the Doctor"), Muhammad Atef (a/k/a Abu Hafs al Masri), Zayn al Abidin Muhammad Husayn (a/k/a/ Abu Zubayda, hereinafter "Abu Zubayda"), Binyam Muhammad, Noor al Deen, Akrama al Sudani and other members and associates of the al Qaida organization, known and unknown, to commit the following offenses triable by military commission: attacking civilians; attacking civilian objects; murder by an unprivileged belligerent; destruction of property by an unprivileged belligerent; and terrorism.

14. In furtherance of this enterprise and conspiracy, al Sharbi, Barhoumi, al Qahtani, Abu Zubayda, Binyam Muhammad, Noor al Deen, Akrama al Sudani, and other members or associates of al Qaida committed the following overt acts:

    a. In 1998 Barhoumi, an Algerian citizen, attended the electronics and explosives course at Khalden Camp in Afghanistan, an al Qaida-affiliated training camp, where he received training in constructing and dismantling electronically-controlled explosives.

    b. After completing his training, Barhoumi became an explosives trainer for al Qaida, training members of al Qaida on electronically-controlled explosives at remote locations.

c.  In or about August 2000, al Sharbi, a Saudi citizen and Electrical engineering graduate of Embry Riddle University, in Prescott, Arizona, departed the United States in search of terrorist training in Afghanistan.

d.  In July 2001, Muhammad Atef (a/k/a/ Abu Hafs al Masri), the head of al Qaida's military committee and al Qaida's military commander, wrote a letter to Abu Muhammad, the *emir* of al Qaida's al Farouq Camp, asking him to select two "brothers" from the camp to receive electronically-controlled explosives training in Pakistan, for the purpose of establishing a new and independent section of the military committee.

e.  In July 2001, al Sharbi attended the al Qaida-run al Farouq training camp, where he was first introduced to Usama bin Laden. At al Farouq, al Sharbi's training included, *inter alia*, physical training, military tactics, weapons instruction, and firing on a variety of individual and crew-served weapons.

f.  During July and August 2001, al Sharbi stood watch with loaded weapons at al Farouq at times when Usama bin Laden visited the camp.

g.  From July 2001 to September 13, 2001, al Sharbi provided English translation for another camp attendee's military training at al Farouq, to include translating the attendee's personal *bayat* ("oath of allegiance") to Usama bin Laden.

h.  On or about September 13, 2001, anticipating a military response to al Qaida's attacks on the United States of September 11, 2001, al Sharbi and the remaining trainees were ordered to evacuate al Farouq. Al Sharbi and others fled the camp and were told to fire warning shots in the air if they saw American missiles approaching.

i.  Shortly after the September 11 2001 attacks on the United States, al Qahtani, a Saudi citizen and Electrical engineering graduate of King Saud University in Saudi Arabia, left Saudi Arabia with the intent to fight against the Northern Alliance and American Forces, whom he expected would soon be fighting in Afghanistan.

j.  In October 2001, al Qahtani attended a newly established terrorist training camp north of Kabul, where he received physical conditioning, and training in the PK Machine gun and AK-47 assault rifle.

k.  Between late December 2001 and the end of February 2002, Abu Zubayda, a high-ranking al Qaida recruiter and operational planner, assisted in moving al Sharbi, al Qahtani and Binyam Muhammad from Birmel, Afghanistan to a guest house in Faisalabad, Pakistan where they would obtain further training.

3

l.  By early March 2002, Abu Zubayda, Barhoumi, al Sharbi, al Qahtani, and Binyam Muhammad had all arrived at the guest house in Faisalabad, Pakistan. Barhoumi was to train al Sharbi, al Qahtani and Binyam Muhammad in building small, hand-held remote-detonation devices for explosives that would later be used in Afghanistan against United States forces.

m.  In March 2002, after Barhoumi, al Sharbi and al Qahtani had all arrived at the guest house, Abu Zubayda provided approximately $1,000 U.S. Dollars for the purchase of components to be used for training al Sharbi and al Qahtani in making remote-detonation devices.

n.  Shortly after receiving the money for the components, Barhoumi, Noor al Deen and other individuals staying at the house went into downtown Faisalabad with a five page list of electrical equipment and devices for purchase which included, *inter alia,* electrical resistors, plastic resistors, light bulbs for circuit board lights, plastic and ceramic diodes, circuit testing boards, an ohmmeter, watches, soldering wire, soldering guns, wire and coil, six cell phones of a specified model, transformers and an electronics manual.

o.  After purchasing the necessary components, al Qahtani and al Sharbi received training from Barhoumi on how to build hand-held remote-detonation devices for explosives while at the guest house.

p.  During March 2002, after his initial training, al Qahtani was given the mission of constructing as many circuit boards as possible with the intent to ship them to Afghanistan to be used as timing devices in bombs.

q.  After their training was completed and a sufficient number of circuit boards were built, Abu Zubayda had directed that al Qahtani and al Sharbi were to return to Afghanistan in order to use, and to train others to construct remote-control devices to detonate car bombs against United States forces.

r.  During March 2002 al Qahtani wrote two instructional manuals on assembling circuit boards that could be used as timing devices for bombs and other improvised explosive devices.

15. On March 28, 2002, Barhoumi, al Sharbi, al Qahtani, Abu Zubayda and others were captured in a safe house in Faisalabad after authorities raided the home.

# EXHIBIT B

57833

Federal Register

Vol 66, No 222

Friday, November 16. 2001

# Presidential Documents

---

Title 3—

The President

Military Order of November 13, 2001

## Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism

By the authority vested in me as President and as Commander in Chief of the Armed Forces of the United States by the Constitution and the laws of the United States of America, including the Authorization for Use of Military Force Joint Resolution (Public Law 107–40, 115 Stat. 224) and sections 821 and 836 of title 10, United States Code, it is hereby ordered as follows:

**Section 1.** *Findings.*

(a) International terrorists, including members of al Qaida, have carried out attacks on United States diplomatic and military personnel and facilities abroad and on citizens and property within the United States on a scale that has created a state of armed conflict that requires the use of the United States Armed Forces.

(b) In light of grave acts of terrorism and threats of terrorism, including the terrorist attacks on September 11, 2001, on the headquarters of the United States Department of Defense in the national capital region, on the World Trade Center in New York, and on civilian aircraft such as in Pennsylvania, I proclaimed a national emergency on September 14, 2001 (Proc. 7463, Declaration of National Emergency by Reason of Certain Terrorist Attacks).

(c) Individuals acting alone and in concert involved in international terrorism possess both the capability and the intention to undertake further terrorist attacks against the United States that, if not detected and prevented, will cause mass deaths, mass injuries, and massive destruction of property, and may place at risk the continuity of the operations of the United States Government.

(d) The ability of the United States to protect the United States and its citizens, and to help its allies and other cooperating nations protect their nations and their citizens, from such further terrorist attacks depends in significant part upon using the United States Armed Forces to identify terrorists and those who support them, to disrupt their activities, and to eliminate their ability to conduct or support such attacks.

(e) To protect the United States and its citizens, and for the effective conduct of military operations and prevention of terrorist attacks, it is necessary for individuals subject to this order pursuant to section 2 hereof to be detained, and, when tried, to be tried for violations of the laws of war and other applicable laws by military tribunals.

(f) Given the danger to the safety of the United States and the nature of international terrorism, and to the extent provided by and under this order, I find consistent with section 836 of title 10, United States Code, that it is not practicable to apply in military commissions under this order the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts.

(g) Having fully considered the magnitude of the potential deaths, injuries, and property destruction that would result from potential acts of terrorism against the United States, and the probability that such acts will occur, I have determined that an extraordinary emergency exists for national defense

purposes, that this emergency constitutes an urgent and compelling government interest, and that issuance of this order is necessary to meet the emergency

Sec. 2. *Definition and Policy.*

(a) The term "individual subject to this order" shall mean any individual who is not a United States citizen with respect to whom I determine from time to time in writing that:

(1) there is reason to believe that such individual, at the relevant times,

(i) is or was a member of the organization known as al Qaida;

(ii) has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefor, that have caused, threaten to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or

(iii) has knowingly harbored one or more individuals described in subparagraphs (i) or (ii) of subsection 2(a)(1) of this order; and

(2) it is in the interest of the United States that such individual be subject to this order

(b) It is the policy of the United States that the Secretary of Defense shall take all necessary measures to ensure that any individual subject to this order is detained in accordance with section 3, and, if the individual is to be tried, that such individual is tried only in accordance with section 4.

(c) It is further the policy of the United States that any individual subject to this order who is not already under the control of the Secretary of Defense but who is under the control of any other officer or agent of the United States or any State shall, upon delivery of a copy of such written determination to such officer or agent, forthwith be placed under the control of the Secretary of Defense.

Sec. 3. *Detention Authority of the Secretary of Defense.* Any individual subject to this order shall be —

(a) detained at an appropriate location designated by the Secretary of Defense outside or within the United States;

(b) treated humanely, without any adverse distinction based on race, color, religion, gender, birth, wealth, or any similar criteria;

(c) afforded adequate food, drinking water, shelter, clothing, and medical treatment;

(d) allowed the free exercise of religion consistent with the requirements of such detention; and

(e) detained in accordance with such other conditions as the Secretary of Defense may prescribe

Sec. 4. *Authority of the Secretary of Defense Regarding Trials of Individuals Subject to this Order.*

(a) Any individual subject to this order shall, when tried, be tried by military commission for any and all offenses triable by military commission that such individual is alleged to have committed, and may be punished in accordance with the penalties provided under applicable law, including life imprisonment or death.

(b) As a military function and in light of the findings in section 1, including subsection (f) thereof, the Secretary of Defense shall issue such orders and regulations, including orders for the appointment of one or more military commissions, as may be necessary to carry out subsection (a) of this section

(c) Orders and regulations issued under subsection (b) of this section shall include, but not be limited to, rules for the conduct of the proceedings of military commissions, including pretrial, trial, and post-trial procedures, modes of proof, issuance of process, and qualifications of attorneys, which shall at a minimum provide for—

(1) military commissions to sit at any time and any place, consistent with such guidance regarding time and place as the Secretary of Defense may provide;

(2) a full and fair trial, with the military commission sitting as the triers of both fact and law;

(3) admission of such evidence as would, in the opinion of the presiding officer of the military commission (or instead, if any other member of the commission so requests at the time the presiding officer renders that opinion, the opinion of the commission rendered at that time by a majority of the commission), have probative value to a reasonable person;

(4) in a manner consistent with the protection of information classified or classifiable under Executive Order 12958 of April 17, 1995, as amended, or any successor Executive Order, protected by statute or rule from unauthorized disclosure, or otherwise protected by law, (A) the handling of, admission into evidence of, and access to materials and information, and (B) the conduct, closure of, and access to proceedings;

(5) conduct of the prosecution by one or more attorneys designated by the Secretary of Defense and conduct of the defense by attorneys for the individual subject to this order;

(6) conviction only upon the concurrence of two-thirds of the members of the commission present at the time of the vote, a majority being present;

(7) sentencing only upon the concurrence of two-thirds of the members of the commission present at the time of the vote, a majority being present; and

(8) submission of the record of the trial, including any conviction or sentence, for review and final decision by me or by the Secretary of Defense if so designated by me for that purpose

Sec. 5. *Obligation of Other Agencies to Assist the Secretary of Defense.*

Departments, agencies, entities, and officers of the United States shall, to the maximum extent permitted by law, provide to the Secretary of Defense such assistance as he may request to implement this order

Sec. 6. *Additional Authorities of the Secretary of Defense.*

(a) As a military function and in light of the findings in section 1, the Secretary of Defense shall issue such orders and regulations as may be necessary to carry out any of the provisions of this order

(b) The Secretary of Defense may perform any of his functions or duties, and may exercise any of the powers provided to him under this order (other than under section 4(c)(8) hereof) in accordance with section 113(d) of title 10, United States Code.

Sec. 7. *Relationship to Other Law and Forums.*—

(a) Nothing in this order shall be construed to—

(1) authorize the disclosure of state secrets to any person not otherwise authorized to have access to them;

(2) limit the authority of the President as Commander in Chief of the Armed Forces or the power of the President to grant reprieves and pardons; or

(3) limit the lawful authority of the Secretary of Defense, any military commander, or any other officer or agent of the United States or of any State to detain or try any person who is not an individual subject to this order.

(b) With respect to any individual subject to this order—

(1) military tribunals shall have exclusive jurisdiction with respect to offenses by the individual; and

(2) the individual shall not be privileged to seek any remedy or maintain any proceeding, directly or indirectly, or to have any such remedy or

57836    Federal Register / Vol. 66, No. 222 / Friday, November 16, 2001 / Presidential Documents

proceeding sought on the individual's behalf, in (i) any court of the United States, or any State thereof, (ii) any court of any foreign nation, or (iii) any international tribunal.

(c) This order is not intended to and does not create any right, benefit, or privilege, substantive or procedural, enforceable at law or equity by any party, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

(d) For purposes of this order, the term "State" includes any State, district, territory, or possession of the United States.

(e) I reserve the authority to direct the Secretary of Defense, at any time hereafter, to transfer to a governmental authority control of any individual subject to this order. Nothing in this order shall be construed to limit the authority of any such governmental authority to prosecute any individual for whom control is transferred.

Sec. 8. *Publication*

This order shall be published in the **Federal Register**.

THE WHITE HOUSE,
*November 13, 2001.*

[FR Doc. 01–28904
Filed 11–15–01; 8:56 am]
Billing code 3195–01–P

# EXHIBIT C



Department of Defense

Military Commission Order No. 1

August 31, 2005

SUBJECT:    Procedures for Trials by Military Commissions of Certain Non-United
States Citizens in the War Against Terrorism

References:  (a)  United States Constitution, Article II, Section 2

(b)  Military Order of November 13, 2001, "Detention, Treatment, and Trial
of Certain Non-Citizens in the War Against Terrorism," 66 F.R. 57833
(Nov. 16, 2001) ("President's Military Order")

(c)  DoD 5200.2-R, "Personnel Security Program," current edition

(d)  Executive Order 12958, "Classified National Security Information"
(April 17, 1995, as amended, or any successor Executive Order)

(e)  Section 603 of title 10, United States Code

(f)  DoD Directive 5025.1, "DoD Directives System," current edition

(g)  Military Commission Order No. 1 (March 21, 2002)

## 1. PURPOSE

This Order implements policy, assigns responsibilities, and prescribes procedures under
references (a) and (b) for trials before military commissions of individuals subject to the
President's Military Order. These procedures shall be implemented and construed so as to ensure
that any such individual receives a full and fair trial before a military commission, as required by
the President's Military Order. Unless otherwise directed by the Secretary of Defense, and except
for supplemental procedures established pursuant to the President's Military Order or this Order,
the procedures prescribed herein and no others shall govern such trials. This Order supersedes
reference (g).

## 2. ESTABLISHMENT OF MILITARY COMMISSIONS

In accordance with the President's Military Order, the Secretary of Defense or a designee
("Appointing Authority") may issue orders from time to time appointing one or more military

commissions to try individuals subject to the President's Military Order and appointing any other personnel necessary to facilitate such trials.

3. JURISDICTION

A. Over Persons

A military commission appointed under this Order ("Commission") shall have jurisdiction over only an individual or individuals ("the Accused") (1) subject to the President's Military Order and (2) alleged to have committed an offense in a charge that has been referred to the Commission by the Appointing Authority.

B. Over Offenses

Commissions established hereunder shall have jurisdiction over violations of the laws of war and all other offenses triable by military commission.

C. Maintaining Integrity of Commission Proceedings

The Commission may exercise jurisdiction over participants in its proceedings as necessary to preserve the integrity and order of the proceedings.

4. COMMISSION PERSONNEL

A. Members

(1) Appointment

The Appointing Authority shall appoint the Presiding Officer, other members, and the alternate member or members of each Commission. The alternate member or members shall attend all sessions of the Commission except sessions with members deliberating and voting on findings and sentence and sessions conducted by the Presiding Officer under Section 4(A)(5)(a), but the absence of an alternate member shall not preclude the Commission from conducting proceedings. Alternate members shall attend deliberations on matters other than findings or sentence, but may not participate in such deliberations or in any voting. In case of incapacity, resignation, or removal of any member, an alternate member, if available, shall take the place of that member, in the sequence designated by the Appointing Authority. Any vacancy among the members or alternate members occurring after a trial has begun may, but need not, be filled by the Appointing Authority, but the substance of all prior proceedings and evidence taken in that case shall be made known to that new member or alternate member before the trial proceeds.

(2) Number of Members

Each Commission shall consist of a Presiding Officer and at least three other members, the number being determined by the Appointing Authority. For each such Commission, the

2

Appointing Authority shall also appoint at the outset of proceedings one or more alternate members, the number being determined by the Appointing Authority.

### (3) Qualifications

Each member and alternate member shall be a commissioned officer of the United States armed forces ("Military Officer"), including without limitation reserve personnel on active duty, National Guard personnel on active duty in Federal service, and retired personnel recalled to active duty. The Appointing Authority shall appoint members and alternate members determined to be competent to perform the duties involved. The Appointing Authority may remove members and alternate members for good cause.

### (4) Presiding Officer

The Appointing Authority shall designate a Presiding Officer to preside over the proceedings of that Commission. The Presiding Officer shall be a Military Officer who is a judge advocate of any United States armed force.

### (5) Duties of the Presiding Officer

(a) The Presiding Officer shall rule upon all questions of law, all challenges for cause, and all interlocutory questions arising during the proceedings. The Presiding Officer may conduct hearings (except hearings on the admissibility of evidence under Section 6(D)(1)) outside the presence of the other members for the purposes of hearing and determining motions, objections, pleas, or such other matters as will promote a fair and expeditious trial. If the Presiding Officer determines that deliberations are necessary to resolve a challenge by another member under Section 6(D)(1) to a ruling by the Presiding Officer on the admissibility of evidence, the Presiding Officer shall deliberate and vote with the other members to determine the admissibility of the evidence in question. The Presiding Officer shall not deliberate or vote with the other members on findings or sentence, nor shall the Presiding Officer be present at such deliberations or votes.

(b) The Presiding Officer shall admit or exclude evidence at trial in accordance with Section 6(D). The Presiding Officer shall have authority to close proceedings or portions of proceedings in accordance with Section 6(B)(3) and for any other reason necessary for the conduct of a full and fair trial.

(c) The Presiding Officer shall ensure that the discipline, dignity, and decorum of the proceedings are maintained, shall exercise control over the proceedings to ensure proper implementation of the President's Military Order and this Order, and shall have authority to act upon any contempt or breach of Commission rules and procedures. Any attorney authorized to appear before a Commission who is thereafter found not to satisfy the requirements for eligibility or who fails to comply with laws, rules, regulations, or other orders applicable to

the Commission proceedings or any other individual who violates such laws, rules, regulations, or orders may be disciplined as the Presiding Officer deems appropriate, including but not limited to revocation of eligibility to appear before that Commission. The Appointing Authority may further revoke that attorney's or any other person's eligibility to appear before any other Commission convened under this Order.

(d) The Presiding Officer shall ensure the expeditious conduct of the trial. In no circumstance shall accommodation of counsel be allowed to delay proceedings unreasonably.

(e) The Presiding Officer shall certify all interlocutory questions, the disposition of which would effect a termination of proceedings with respect to a charge, for decision by the Appointing Authority. The Presiding Officer may certify other interlocutory questions to the Appointing Authority as the Presiding Officer deems appropriate.

(f) As soon as practicable at the conclusion of each Commission session, the Presiding Officer shall transmit an authenticated copy of the proceedings to the Appointing Authority.

(6) Duties of the Other Members

The other members of the Commission shall determine the findings and sentence without the Presiding Officer, and may vote on the admission of evidence, with the Presiding Officer, in accordance with Section 6(D)(1).

B. Prosecution

(1) Office of the Chief Prosecutor

The Chief Prosecutor shall be a judge advocate of any United States armed force, shall supervise the overall prosecution efforts under the President's Military Order, and shall ensure proper management of personnel and resources.

(2) Prosecutors and Assistant Prosecutors

Consistent with any supplementary regulations or instructions issued under Section 7(A), the Chief Prosecutor shall detail a Prosecutor and, as appropriate, one or more Assistant Prosecutors to prepare charges and conduct the prosecution for each case before a Commission ("Prosecution"). Prosecutors and Assistant Prosecutors shall be (a) Military Officers who are judge advocates of any United States armed force, or (b) special trial counsel of the Department of Justice who may be made available by the Attorney General of the United States. The duties of the Prosecution are:

4

(a) To prepare charges for approval and referral by the Appointing Authority;

(b) To conduct the prosecution before the Commission of all cases referred for trial; and

(c) To represent the interests of the Prosecution in any review process.

C. Defense

(1) Office of the Chief Defense Counsel

The Chief Defense Counsel shall be a judge advocate of any United States armed force, shall supervise the overall defense efforts under the President's Military Order, shall ensure proper management of personnel and resources, shall preclude conflicts of interest, and shall facilitate proper representation of all Accused.

(2) Detailed Defense Counsel.

Consistent with any supplementary regulations or instructions issued under Section 7(A), the Chief Defense Counsel shall detail one or more Military Officers who are judge advocates of any United States armed force to conduct the defense for each case before a Commission ("Detailed Defense Counsel"). The duties of the Detailed Defense Counsel are:

(a) To defend the Accused zealously within the bounds of the law without regard to personal opinion as to the guilt of the Accused; and

(b) To represent the interests of the Accused in any review process as provided by this Order.

(3) Choice of Counsel

(a) The Accused may select a Military Officer who is a judge advocate of any United States armed force to replace the Accused's Detailed Defense Counsel, provided that Military Officer has been determined to be available in accordance with any applicable supplementary regulations or instructions issued under Section 7(A). After such selection of a new Detailed Defense Counsel, the original Detailed Defense Counsel will be relieved of all duties with respect to that case. If requested by the Accused, however, the Chief Defense Counsel may allow the original Detailed Defense Counsel to continue to assist in representation of the Accused as another Detailed Defense Counsel.

(b) The Accused may also retain the services of a civilian attorney of the Accused's own choosing and at no expense to the United States Government ("Civilian Defense Counsel"), provided that attorney: (i) is a

5

United States citizen; (ii) is admitted to the practice of law in a State, district, territory, or possession of the United States, or before a Federal court; (iii) has not been the subject of any sanction or disciplinary action by any court, bar, or other competent governmental authority for relevant misconduct; (iv) has been determined to be eligible for access to information classified at the level SECRET or higher under the authority of and in accordance with the procedures prescribed in reference (c); and (v) has signed a written agreement to comply with all applicable regulations or instructions for counsel, including any rules of court for conduct during the course of proceedings. Civilian attorneys may be pre-qualified as members of the pool of available attorneys if, at the time of application, they meet the relevant criteria, or they may be qualified on an *ad hoc* basis after being requested by an Accused. Representation by Civilian Defense Counsel will not relieve Detailed Defense Counsel of the duties specified in Section 4(C)(2). The qualification of a Civilian Defense Counsel does not guarantee that person's presence at closed Commission proceedings or that person's access to any information protected under Section 6(D)(5).

(4) Continuity of Representation

The Accused must be represented at all relevant times by Detailed Defense Counsel. Detailed Defense Counsel and Civilian Defense Counsel shall be herein referred to collectively as "Defense Counsel." The Accused and Defense Counsel shall be herein referred to collectively as "the Defense."

D. Other Personnel

Other personnel, such as court reporters, interpreters, security personnel, bailiffs, and clerks may be detailed or employed by the Appointing Authority, as necessary.

5. PROCEDURES ACCORDED THE ACCUSED

The following procedures shall apply with respect to the Accused:

A. The Prosecution shall furnish to the Accused, sufficiently in advance of trial to prepare a defense, a copy of the charges in English and, if appropriate, in another language that the Accused understands.

B. The Accused shall be presumed innocent until proven guilty.

C. A Commission member, other than the Presiding Officer, shall vote for a finding of Guilty as to an offense if and only if that member is convinced beyond a reasonable doubt, based on the evidence admitted at trial, that the Accused is guilty of the offense.

D. At least one Detailed Defense Counsel shall be made available to the Accused sufficiently in advance of trial to prepare a defense and until any findings and sentence become final in accordance with Section 6(H)(2).

E. The Prosecution shall provide the Defense with access to evidence the Prosecution intends to introduce at trial and with access to evidence known to the Prosecution that tends to exculpate the Accused. Such access shall be consistent with Section 6(D)(5) and subject to Section 9.

F. The Accused shall not be required to testify during trial. A Commission shall draw no adverse inference from an Accused's decision not to testify. This subsection shall not preclude admission of evidence of prior statements or conduct of the Accused.

G. If the Accused so elects, the Accused may testify at trial on the Accused's own behalf and shall then be subject to cross-examination.

H. The Accused may obtain witnesses and documents for the Accused's defense, to the extent necessary and reasonably available as determined by the Presiding Officer. Such access shall be consistent with the requirements of Section 6(D)(5) and subject to Section 9. The Appointing Authority shall order that such investigative or other resources be made available to the Defense as the Appointing Authority deems necessary for a full and fair trial.

I. The Accused may have Defense Counsel present evidence at trial in the Accused's defense and cross-examine each witness presented by the Prosecution who appears before the Commission.

J. The Prosecution shall ensure that the substance of the charges, the proceedings, and any documentary evidence are provided in English and, if appropriate, in another language that the Accused understands. The Appointing Authority may appoint one or more interpreters to assist the Defense, as necessary.

K. The Accused shall be present at every stage of the trial before the Commission, to the extent consistent with Section 6(B)(3), unless the Accused engages in disruptive conduct that justifies exclusion by the Presiding Officer. Detailed Defense Counsel may not be excluded from any trial proceeding or portion thereof.

L. Except by order of the Presiding Officer for good cause shown, the Prosecution shall provide the Defense with access before sentencing proceedings to evidence the Prosecution intends to present in such proceedings. Such access shall be consistent with Section 6(D)(5) and subject to Section 9.

M. The Accused may make a statement during sentencing proceedings.

N. The Accused may have Defense Counsel submit evidence to the Commission during sentencing proceedings.

O. The Accused shall be afforded a trial open to the public (except proceedings closed by the Presiding Officer), consistent with Section 6(B).

P. The Accused shall not again be tried by any Commission for a charge once a Commission's finding on that charge becomes final in accordance with Section 6(H)(2).

# 6. CONDUCT OF THE TRIAL

A. Pretrial Procedures

(1) Preparation of the Charges

The Prosecution shall prepare charges for approval by the Appointing Authority, as provided in Section 4(B)(2)(a).

(2) Referral to the Commission

The Appointing Authority may approve and refer for trial any charge against an individual or individuals within the jurisdiction of a Commission in accordance with Section 3(A) and alleging an offense within the jurisdiction of a Commission in accordance with Section 3(B).

(3) Notification of the Accused

The Prosecution shall provide copies of the charges approved by the Appointing Authority to the Accused and Defense Counsel. The Prosecution also shall submit the charges approved by the Appointing Authority to the Presiding Officer of the Commission to which they were referred.

(4) Plea Agreements

The Accused, through Defense Counsel, and the Prosecution may submit for approval to the Appointing Authority a plea agreement mandating a sentence limitation or any other provision in exchange for an agreement to plead guilty, or any other consideration. Any agreement to plead guilty must include a written stipulation of fact, signed by the Accused, that confirms the guilt of the Accused and the voluntary and informed nature of the plea of guilty. If the Appointing Authority approves the plea agreement, the Presiding Officer will, after determining the voluntary and informed nature of the plea agreement, admit the plea agreement and stipulation into evidence and the Commission will be bound to adjudge findings and a sentence pursuant to that plea agreement.

(5) Issuance and Service of Process; Obtaining Evidence

The Commission shall have power to:

(a) Summon witnesses to attend trial and testify;

(b) Administer oaths or affirmations to witnesses and other persons and to question witnesses;

(c) Require the production of documents and other evidentiary material; and

(d) Designate special commissioners to take evidence.

The Presiding Officer shall exercise these powers on behalf of the Commission at the Presiding Officer's own initiative, or at the request of the Prosecution or the Defense, as necessary to ensure a full and fair trial in accordance with the President's Military Order and this Order. The Commission shall issue its process in the name of the Department of Defense over the signature of the Presiding Officer. Such process shall be served as directed by the Presiding Officer in a manner calculated to give reasonable notice to persons required to take action in accordance with that process.

B. Duties of the Commission During Trial

The Commission shall:

(1) Provide a full and fair trial.

(2) Proceed impartially and expeditiously, strictly confining the proceedings to a full and fair trial of the charges, excluding irrelevant evidence, and preventing any unnecessary interference or delay.

(3) Hold open proceedings except where otherwise decided by the Appointing Authority or the Presiding Officer in accordance with the President's Military Order and this Order. Grounds for closure include the protection of information classified or classifiable under reference (d); information protected by law or rule from unauthorized disclosure; the physical safety of participants in Commission proceedings, including prospective witnesses; intelligence and law enforcement sources, methods, or activities; and other national security interests. The Presiding Officer may decide to close all or part of a proceeding on the Presiding Officer's own initiative or based upon a presentation, including an *ex parte, in camera* presentation by either the Prosecution or the Defense. A decision to close a proceeding or portion thereof may include a decision to exclude the Accused, Civilian Defense Counsel, or any other person, but Detailed Defense Counsel may not be excluded from any trial proceeding or portion thereof. Except with the prior authorization of the Presiding Officer and subject to Section 9, Defense Counsel may not disclose any information presented during a closed session to individuals excluded from such proceeding or part thereof. Open proceedings may include, at the discretion of the Appointing Authority, attendance by the public and accredited press, and public release of transcripts at the appropriate time. Proceedings should be open to the maximum extent practicable.

9

Photography, video, or audio broadcasting, or recording of or at Commission proceedings shall be prohibited, except photography, video, and audio recording by the Commission pursuant to the direction of the Presiding Officer as necessary for preservation of the record of trial.

(4) Hold each session at such time and place as may be directed by the Appointing Authority. Members of the Commission may meet in closed conference at any time authorized by the Presiding Officer.

C. Oaths

(1) All members of a Commission, all Prosecutors, all Defense Counsel, all court reporters, all security personnel, and all interpreters shall take an oath to perform their duties faithfully.

(2) Each witness appearing before a Commission shall be examined under oath, as provided in Section 6(D)(2)(b).

(3) An oath includes an affirmation. Any formulation that appeals to the conscience of the person to whom the oath is administered and that binds that person to speak the truth, or, in the case of one other than a witness, properly to perform certain duties, is sufficient.

D. Evidence

(1) Admissibility

Evidence shall be admitted if, in the opinion of the Presiding Officer (or instead, if any other member of the Commission so requests at the time the Presiding Officer renders that opinion, the opinion of the Commission rendered at that time by a majority of the Commission) the evidence would have probative value to a reasonable person.

(2) Witnesses

(a) Production of Witnesses

The Prosecution or the Defense may request that the Commission hear the testimony of any person, and such testimony shall be received if found to be admissible and not cumulative. The Presiding Officer on his own initiative, or if requested by other members of the Commission, may also summon and hear witnesses. The Presiding Officer may permit the testimony of witnesses by telephone, audiovisual means, or other means; however, the Commission shall consider the ability to test the veracity of that testimony in evaluating the weight to be given to the testimony of the witness.

(b) Testimony

Testimony of witnesses shall be given under oath or affirmation. The Commission may still hear a witness who refuses to swear an oath or make a solemn undertaking; however, the Commission shall consider the refusal to swear an oath or give an affirmation in evaluating the weight to be given to the testimony of the witness.

### (c) Examination of Witnesses

A witness who testifies before the Commission is subject to both direct examination and cross examination. The Presiding Officer shall maintain order in the proceedings and shall not permit badgering of witnesses or questions that are not material to the issues before the Commission. Members of the Commission may submit written questions to the Presiding Officer for the witnesses at any time.

### (d) Protection of Witnesses

The Presiding Officer shall consider the safety of witnesses and others, as well as the safeguarding of Protected Information as defined in Section 6(D)(5)(a), in determining the appropriate methods of receiving testimony and evidence. The Presiding Officer may hear any presentation by the Prosecution or the Defense, including an *ex parte, in camera* presentation, regarding the safety of potential witnesses before determining the ways in which witnesses and evidence will be protected. The Presiding Officer may authorize any methods appropriate for the protection of witnesses and evidence. Such methods may include, but are not limited to: testimony by telephone, audiovisual means, or other electronic means; closure of the proceedings; introduction of prepared declassified summaries of evidence; and the use of pseudonyms.

### (3) Other Evidence

Subject to the requirements of Section 6(D)(1) concerning admissibility, the Commission may consider any other evidence including, but not limited to, testimony from prior trials and proceedings, sworn or unsworn written statements, physical evidence, or scientific or other reports.

### (4) Notice

The Presiding Officer may, after affording the Prosecution and the Defense an opportunity to be heard, take conclusive notice of facts that are not subject to reasonable dispute either because they are generally known or are capable of determination by resort to sources that cannot reasonably be contested. The Presiding Officer shall inform the other members of any facts conclusively noticed under this provision.

### (5) Protection of Information

### (a) Protective Order

The Presiding Officer may issue protective orders as necessary to carry out the President's Military Order and this Order, including to safeguard "Protected Information," which includes: (i) information classified or classifiable pursuant to reference (d); (ii) information protected by law or rule from unauthorized disclosure; (iii) information the disclosure of which may endanger the physical safety of participants in Commission proceedings, including prospective witnesses; (iv) information concerning intelligence and law enforcement sources, methods, or activities; or (v) information concerning other national security interests. As soon as practicable, counsel for either side will notify the Presiding Officer of any intent to offer evidence involving Protected Information.

### (b) Limited Disclosure

The Presiding Officer, upon motion of the Prosecution or *sua sponte,* shall, as necessary to protect the interests of the United States and consistent with Section 9, direct (i) the deletion of specified items of Protected Information from documents to be made available to the Accused, Detailed Defense Counsel, or Civilian Defense Counsel; (ii) the substitution of a portion or summary of the information for such Protected Information; or (iii) the substitution of a statement of the relevant facts that the Protected Information would tend to prove. The Prosecution's motion and any materials submitted in support thereof or in response thereto shall, upon request of the Prosecution, be considered by the Presiding Officer *ex parte, in camera,* but no Protected Information shall be admitted into evidence for consideration by the Commission if not presented to Detailed Defense Counsel. The Accused and the Civilian Defense Counsel shall be provided access to Protected Information falling under Section 5(E) to the extent consistent with national security, law enforcement interests, and applicable law. If access to such Protected Information is denied and an adequate substitute for that information, such as described above, is unavailable, the Prosecution shall not introduce the Protected Information as evidence without the approval of the Chief Prosecutor; and the Presiding Officer, notwithstanding any determination of probative value under Section 6(D)(1), shall not admit the Protected Information as evidence if the admission of such evidence would result in the denial of a full and fair trial.

### (c) Closure of Proceedings

The Presiding Officer may direct the closure of proceedings in accordance with Section 6(B)(3).

### (d) Protected Information as Part of the Record of Trial

All exhibits admitted as evidence but containing Protected Information shall be sealed and annexed to the record of trial. Additionally, any Protected Information not admitted as evidence but reviewed *in camera* and subsequently withheld from the Defense over Defense objection shall, with the associated motions and responses and any materials submitted in support thereof, be sealed and annexed to the record of trial as additional exhibits. Such sealed material shall be made available to reviewing authorities in closed proceedings.

### E. Proceedings During Trial

The proceedings at each trial will be conducted substantially as follows, unless modified by the Presiding Officer to suit the particular circumstances:

(1) Each charge will be read, or its substance communicated, in the presence of the Accused and the Commission.

(2) The Presiding Officer shall ask each Accused whether the Accused pleads "Guilty" or "Not Guilty." Should the Accused refuse to enter a plea, the Presiding Officer shall enter a plea of "Not Guilty" on the Accused's behalf. If the plea to an offense is "Guilty," the Presiding Officer shall enter a finding of Guilty on that offense after conducting sufficient inquiry to form an opinion that the plea is voluntary and informed. Any plea of Guilty that is not determined to be voluntary and informed shall be changed to a plea of Not Guilty. Plea proceedings shall then continue as to the remaining charges. If a plea of "Guilty" is made on all charges, the Commission shall proceed to sentencing proceedings; if not, the Commission shall proceed to trial as to the charges for which a "Not Guilty" plea has been entered.

(3) The Prosecution shall make its opening statement.

(4) The witnesses and other evidence for the Prosecution shall be heard or received.

(5) The Defense may make an opening statement after the Prosecution's opening statement or prior to presenting its case.

(6) The witnesses and other evidence for the Defense shall be heard or received.

(7) Thereafter, the Prosecution and the Defense may introduce evidence in rebuttal and surrebuttal.

(8) The Prosecution shall present argument to the Commission. Defense Counsel shall be permitted to present argument in response, and then the Prosecution may reply in rebuttal.

(9) After the members of the Commission, other than the Presiding Officer, deliberate and vote on findings in closed conference, the senior-ranking member who voted on findings shall announce the Commission's findings in the presence of the entire Commission, the Prosecution, the Accused, and Defense Counsel. The individual votes of the members of the Commission shall not be disclosed.

(10) In the event a finding of Guilty is entered for an offense, the Prosecution and the Defense may present information to aid the Commission in determining an appropriate sentence. The Accused may testify and shall be subject to cross examination regarding any such testimony.

(11) The Prosecution and, thereafter, the Defense shall present argument to the Commission regarding sentencing.

(12) After the members of the Commission, other than the Presiding Officer, deliberate and vote on a sentence in closed conference, the senior-ranking member who voted on a sentence shall announce the Commission's sentence in the presence of the entire Commission, the Prosecution, the Accused, and Defense Counsel. The individual votes of the members of the Commission shall not be disclosed.

### F. Voting

In accordance with instructions from the Presiding Officer, the other members of the Commission shall deliberate and vote in closed conference. Such a Commission member shall vote for a finding of Guilty as to an offense if and only if that member is convinced beyond a reasonable doubt, based on the evidence admitted at trial, that the Accused is guilty of the offense. An affirmative vote of two-thirds of the other members is required for a finding of Guilty. When appropriate, the other members of the Commission may adjust a charged offense by exceptions and substitutions of language that do not substantially change the nature of the offense or increase its seriousness, or it may vote to convict of a lesser-included offense. An affirmative vote of two-thirds of the other members is required to determine a sentence, except that a sentence of death requires a unanimous, affirmative vote of all of the other members. Votes on findings and sentences shall be taken by secret, written ballot. The Presiding Officer shall not participate in, or be present during, the deliberations or votes on findings or sentence by the other members of the Commission.

### G. Sentence

Upon conviction of an Accused, in accordance with instructions from the Presiding Officer, the other members of the Commission shall impose a sentence that is appropriate to the offense or offenses for which there was a finding of Guilty, which sentence may include death, imprisonment for life or for any lesser term, payment of a fine or restitution, or such other lawful punishment or condition of punishment as the other members of the Commission shall determine to be proper. Only a Commission that includes at least seven other members may sentence an Accused to death. A Commission may (subject to rights of third parties) order confiscation of any property of a convicted Accused, deprive that Accused of any stolen property, or order the delivery of such property to the United States for disposition.

### H. Post-Trial Procedures

#### (1) Record of Trial

Each Commission shall make a verbatim transcript of its proceedings, apart from all Commission deliberations, and preserve all evidence admitted in the trial (including any sentencing proceedings) of each case brought before it, which shall constitute the record of trial. The court reporter shall prepare the official record of trial and submit it to the Presiding Officer for

authentication upon completion. The Presiding Officer shall transmit the authenticated record of trial to the Appointing Authority. If the Secretary of Defense is serving as the Appointing Authority, the record shall be transmitted to the Review Panel constituted under Section 6(H)(4).

### (2) Finality of Findings and Sentence

A Commission finding as to a charge and any sentence of a Commission becomes final when the President or, if designated by the President, the Secretary of Defense makes a final decision thereon pursuant to Section 4(c)(8) of the President's Military Order and in accordance with Section 6(H)(6) of this Order. An authenticated finding of Not Guilty as to a charge shall not be changed to a finding of Guilty. Any sentence made final by action of the President or the Secretary of Defense shall be carried out promptly. Adjudged confinement shall begin immediately following the trial.

### (3) Review by the Appointing Authority

If the Secretary of Defense is not the Appointing Authority, the Appointing Authority shall promptly perform an administrative review of the record of trial. If satisfied that the proceedings of the Commission were administratively complete, the Appointing Authority shall transmit the record of trial to the Review Panel constituted under Section 6(H)(4). If not so satisfied, the Appointing Authority shall return the case for any necessary supplementary proceedings.

### (4) Review Panel

The Secretary of Defense shall designate a Review Panel consisting of three Military Officers, which may include civilians commissioned pursuant to reference (e). At least one member of each Review Panel shall have experience as a judge. The Review Panel shall review the record of trial and, in its discretion, any written submissions from the Prosecution and the Defense and shall deliberate in closed conference. The Review Panel shall disregard any variance from procedures specified in this Order or elsewhere that would not materially have affected the outcome of the trial before the Commission. Within seventy-five days after receipt of the record of trial, the Review Panel shall either (a) forward the case to the Secretary of Defense with a recommendation as to disposition, or (b) return the case to the Appointing Authority for further proceedings, provided that a majority of the Review Panel has formed a definite and firm conviction that a material error of law occurred.

### (5) Review by the Secretary of Defense

The Secretary of Defense shall review the record of trial and the recommendation of the Review Panel and either return the case for further proceedings or, unless making the final decision pursuant to a Presidential designation under Section 4(c)(8) of the President's Military Order, forward it to the President with a recommendation as to disposition.

### (6) Final Decision

After review by the Secretary of Defense, the record of trial and all recommendations will be forwarded to the President for review and final decision (unless the President has designated the Secretary of Defense to perform this function). If the President has so designated the Secretary of Defense, the Secretary may approve or disapprove findings or change a finding of Guilty to a finding of Guilty to a lesser-included offense, or mitigate, commute, defer, or suspend the sentence imposed or any portion thereof. If the Secretary of Defense is authorized to render the final decision, the review of the Secretary of Defense under Section 6(H)(5) shall constitute the final decision.

## 7. REGULATIONS

### A. Supplementary Regulations and Instructions

The Appointing Authority shall, subject to approval of the General Counsel of the Department of Defense if the Appointing Authority is not the Secretary of Defense, publish such further regulations consistent with the President's Military Order and this Order as are necessary or appropriate for the conduct of proceedings by Commissions under the President's Military Order. The General Counsel shall issue such instructions consistent with the President's Military Order and this Order as the General Counsel deems necessary to facilitate the conduct of proceedings by such Commissions, including those governing the establishment of Commission-related offices and performance evaluation and reporting relationships.

### B. Construction

In the event of any inconsistency between the President's Military Order and this Order, including any supplementary regulations or instructions issued under Section 7(A), the provisions of the President's Military Order shall govern. In the event of any inconsistency between this Order and any regulations or instructions issued under Section 7(A), the provisions of this Order shall govern.

## 8. AUTHORITY

Nothing in this Order shall be construed to limit in any way the authority of the President as Commander in Chief of the Armed Forces or the power of the President to grant reprieves and pardons. Nothing in this Order shall affect the authority to constitute military commissions for a purpose not governed by the President's Military Order.

## 9. PROTECTION OF STATE SECRETS

Nothing in this Order shall be construed to authorize disclosure of state secrets to any person not authorized to receive them.

## 10. OTHER

This Order is not intended to and does not create any right, benefit, or privilege, substantive or procedural, enforceable by any party, against the United States, its departments, agencies, or

*DoD MCO No. 1, August 31, 2005*

other entities, its officers or employees, or any other person. No provision in this Order shall be construed to be a requirement of the United States Constitution. Section and subsection captions in this document are for convenience only and shall not be used in construing the requirements of this Order. Failure to meet a time period specified in this Order, or supplementary regulations or instructions issued under Section 7(A), shall not create a right to relief for the Accused or any other person. Reference (f) shall not apply to this Order or any supplementary regulations or instructions issued under Section 7(A).

## 11. AMENDMENT

The Secretary of Defense may amend this Order from time to time.

## 12. DELEGATION

The authority of the Secretary of Defense to make requests for assistance under Section 5 of the President's Military Order is delegated to the General Counsel of the Department of Defense. The Executive Secretary of the Department of Defense shall provide such assistance to the General Counsel as the General Counsel determines necessary for this purpose.

## 13. EFFECTIVE DATE

This Order is effective immediately.

Donald H. Rumsfeld
Secretary of Defense

17

# EXHIBIT D

United States Department of Defense

# News Release



On the web: http://www.defenselink.mil/cgi-bin/dlprint.cgi?
http://www.defenselink.mil/releases/2004/nr20040707-0992.html
Media contact: +1 (703) 697-5131
Public contact: http://www.dod.mil/faq/comment.html or +1 (703) 428-0711

IMMEDIATE RELEASE

No. 651-04
July 7, 2004

## COMBATANT STATUS REVIEW TRIBUNAL ORDER ISSUED

The Department of Defense announced today the formation of the Combatant Status Review Tribunal for detainees held at Guantanamo Bay, Cuba. This tribunal will serve as a forum for detainees to contest their status as enemy combatants.

Detainees held at Guantanamo Bay will be notified within 10 days of their opportunity to contest their enemy combatant status under this process. The tribunal process will start as soon as possible. Detainees will also be notified of their right to seek a writ of habeas corpus in the courts of the United States. Habeas corpus is a writ ordering a person in custody to be brought before a court.

An individual tribunal will be comprised of three neutral officers, none of whom were involved with the detainee. One of the tribunal members will be a judge advocate and the senior ranking officer will serve as the president of the tribunal.

Each detainee will be assigned a military officer as a personal representative. That officer will assist the detainee in preparing for a tribunal hearing. Detainees will have the right to testify before the tribunal, call witnesses and introduce any other evidence. Following the hearing of testimony and other evidence, the tribunal will determine in a closed-door session whether the detainee is properly held as an enemy combatant. Any detainee who is determined not to be an enemy combatant will be transferred to their country of citizenship or other disposition consistent with domestic and international obligations and U.S. foreign policy.

This tribunal does not replace the administrative review procedure announced earlier this year.

Case 1:05-cr-02348-EGS   Document 3   Filed 12/13/2005   Page 59 of 87

The order establishing the tribunals and a DoD Fact Sheet are available at:
http://www.defenselink.mil/news/Jul2004/d20040707review.pdf
http://www.defenselink.mil/news/Jul2004/d20040707factsheet.pdf


http://www.defenselink.mil/releases/2004/nr20040707-0992.html

# EXHIBIT E



# Department of Defense
# Military Commission Instruction No. 2

April 30, 2003

SUBJECT:   Crimes and Elements for Trials by Military Commission

References:   (a)  Military Commission Order No. 1 (Mar. 21, 2002)

    (b)  Military Order of November 13, 2001, "Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism," 66 F.R. 57833 (Nov. 16, 2001)

    (c)  Section 113(d) of Title 10 of the United States Code

    (d)  Section 140(b) of Title 10 of the United States Code

    (e)  Section 821 of Title 10 of the United States Code

    (f)  Military Commission Instruction No. 1, current edition

## 1. PURPOSE

This Instruction provides guidance with respect to crimes that may be tried by military commissions established pursuant to references (a) and (b) and enumerates the elements of those crimes.

## 2. AUTHORITY

This Instruction is issued pursuant to Section 7(A) of reference (a) and in accordance with references (b) through (e). The provisions of reference (f) are applicable to this Instruction.

## 3. GENERAL

A. *Background.* The following crimes and elements thereof are intended for use by military commissions established pursuant to references (a) and (b), the jurisdiction of which extends to offenses or offenders that by statute or the law of armed conflict may be tried by military commission as limited by reference (b). No offense is cognizable in a trial by military commission if that offense did not exist prior to the conduct in question. These crimes and elements derive from the law of armed conflict, a body of law that is sometimes referred to as the law of war. They constitute violations of the law of armed conflict or offenses that, consistent with that

body of law, are triable by military commission. Because this document is declarative of existing law, it does not preclude trial for crimes that occurred prior to its effective date.

B. *Effect of Other Laws*. No conclusion regarding the applicability or persuasive authority of other bodies of law should be drawn solely from the presence, absence, or similarity of particular language in this Instruction as compared to other articulations of law.

C. *Non-Exclusivity*. This Instruction does not contain a comprehensive list of crimes triable by military commission. It is intended to be illustrative of applicable principles of the common law of war but not to provide an exclusive enumeration of the punishable acts recognized as such by that law. The absence of a particular offense from the corpus of those enumerated herein does not preclude trial for that offense.

## 4. APPLICABLE PRINCIPLES OF LAW

A. *General Intent*. All actions taken by the Accused that are necessary for completion of a crime must be performed with general intent. This intent is not listed as a separate element. When the mens rea required for culpability to attach involves an intent that a particular consequence occur, or some other specific intent, an intent element is included. The necessary relationship between such intent element and the conduct constituting the actus reus is not articulated for each set of elements, but is presumed; a nexus between the two is necessary.

B. *The Element of Wrongfulness and Defenses*. Conduct must be wrongful to constitute one of the offenses enumerated herein or any other offense triable by military commission. Conduct is wrongful if it is done without justification or excuse cognizable under applicable law. The element of wrongfulness (or the absence of lawful justification or excuse), which may be required under the customary law of armed conflict, is not repeated in the elements of crimes below. Conduct satisfying the elements found herein shall be inferred to be wrongful in the absence of evidence to the contrary. Similarly, this Instruction does not enunciate defenses that may apply for specific offenses, though an Accused is entitled to raise any defense available under the law of armed conflict. Defenses potentially available to an Accused under the law of armed conflict, such as self-defense, mistake of fact, and duress, may be applicable to certain offenses subject to trial by military commission. In the absence of evidence to the contrary, defenses in individual cases shall be presumed not to apply. The burden of going forward with evidence of lawful justification or excuse or any applicable defense shall be upon the Accused. With respect to the issue of combatant immunity raised by the specific enumeration of an element requiring the absence thereof, the prosecution must affirmatively prove that element regardless of whether the issue is raised by the defense. Once an applicable defense or an issue of lawful justification or lawful excuse is fairly raised by the evidence presented, except for the defense of lack of mental responsibility, the burden is on the prosecution to establish beyond a reasonable doubt that the conduct was wrongful or that the defense does not apply. With respect to the defense of lack of mental responsibility, the

Accused has the burden of proving by clear and convincing evidence that, as a result of a severe mental disease or defect, the Accused was unable to appreciate the nature and quality of the wrongfulness of the Accused's acts. As provided in Section 5(C) of reference (a), the prosecution bears the burden of establishing the Accused's guilt beyond a reasonable doubt in all cases tried by a military commission. Each element of an offense enumerated herein must be proven beyond a reasonable doubt.

C. *Statute of Limitations.* Violations of the laws of war listed herein are not subject to any statute of limitations.

## 5. DEFINITIONS

A. *Combatant immunity.* Under the law of armed conflict, only a lawful combatant enjoys "combatant immunity" or "belligerent privilege" for the lawful conduct of hostilities during armed conflict.

B. *Enemy.* "Enemy" includes any entity with which the United States or allied forces may be engaged in armed conflict, or which is preparing to attack the United States. It is not limited to foreign nations, or foreign military organizations or members thereof. "Enemy" specifically includes any organization of terrorists with international reach.

C. *In the context of and was associated with armed conflict.* Elements containing this language require a nexus between the conduct and armed hostilities. Such nexus could involve, but is not limited to, time, location, or purpose of the conduct in relation to the armed hostilities. The existence of such factors, however, may not satisfy the necessary nexus (*e.g.*, murder committed between members of the same armed force for reasons of personal gain unrelated to the conflict, even if temporally and geographically associated with armed conflict, is not "in the context of" the armed conflict). The focus of this element is not the nature or characterization of the conflict, but the nexus to it. This element does not require a declaration of war, ongoing mutual hostilities, or confrontation involving a regular national armed force. A single hostile act or attempted act may provide sufficient basis for the nexus so long as its magnitude or severity rises to the level of an "armed attack" or an "act of war," or the number, power, stated intent or organization of the force with which the actor is associated is such that the act or attempted act is tantamount to an attack by an armed force. Similarly, conduct undertaken or organized with knowledge or intent that it initiate or contribute to such hostile act or hostilities would satisfy the nexus requirement.

D. *Military Objective.* "Military objectives" are those potential targets during an armed conflict which, by their nature, location, purpose, or use, effectively contribute to the opposing force's war-fighting or war-sustaining capability and whose total or partial destruction, capture, or neutralization would constitute a military advantage to the attacker under the circumstances at the time of the attack.

E. *Object of the attack.* "Object of the attack" refers to the person, place, or thing intentionally targeted. In this regard, the term includes neither collateral damage nor incidental injury or death.

3

*DoD MCI No. 2, April 30, 2003*

F. *Protected property.* "Protected property" refers to property specifically protected by the law of armed conflict such as buildings dedicated to religion, education, art, science or charitable purposes, historic monuments, hospitals, or places where the sick and wounded are collected, provided they are not being used for military purposes or are not otherwise military objectives. Such property would include objects properly identified by one of the distinctive emblems of the Geneva Conventions but does not include all civilian property.

G. *Protected under the law of war.* The person or object in question is expressly "protected" under one or more of the Geneva Conventions of 1949 or, to the extent applicable, customary international law. The term does not refer to all who enjoy some form of protection as a consequence of compliance with international law, but those who are expressly designated as such by the applicable law of armed conflict. For example, persons who either are *hors de combat* or medical or religious personnel taking no active part in hostilities are expressly protected, but other civilians may not be.

H. *Should have known.* The facts and circumstances were such that a reasonable person in the Accused's position would have had the relevant knowledge or awareness.

## 6. CRIMES AND ELEMENTS

A. *Substantive Offenses—War Crimes.* The following enumerated offenses, if applicable, should be charged in separate counts. Elements are drafted to reflect conduct of the perpetrator. Each element need not be specifically charged.

### 1) Willful Killing Of Protected Persons

a. *Elements.*

(1) The accused killed one or more persons;

(2) The accused intended to kill such person or persons;

(3) Such person or persons were protected under the law of war;

(4) The accused knew or should have known of the factual circumstances that established that protected status; and

(5) The killing took place in the context of and was associated with armed conflict.

b. *Comments.*

(1) The intent required for this offense precludes its applicability with regard to collateral damage or injury incident to a lawful attack.

4

2) **Attacking Civilians**

   a. *Elements.*

     (1) The accused engaged in an attack;

     (2) The object of the attack was a civilian population as such or individual civilians not taking direct or active part in hostilities;

     (3) The accused intended the civilian population as such or individual civilians not taking direct or active part in hostilities to be an object of the attack; and

     (4) The attack took place in the context of and was associated with armed conflict.

   b. *Comments.*

     (1) The intent required for this offense precludes its applicability with regard to collateral damage or injury incident to a lawful attack.

3) **Attacking Civilian Objects**

   a. *Elements.*

     (1) The accused engaged in an attack;

     (2) The object of the attack was civilian property, that is, property that was not a military objective;

     (3) The accused intended such property to be an object of the attack;

     (4) The accused knew or should have known that such property was not a military objective; and

     (5) The attack took place in the context of and was associated with armed conflict.

   b. *Comments.*

     (1) The intent required for this offense precludes its applicability with regard to collateral damage or injury incident to a lawful attack.

4) **Attacking Protected Property**

   a. *Elements.*

     (1) The accused engaged in an attack;

     (2) The object of the attack was protected property;

     (3) The accused intended such property to be an object of the attack;

     (4) The accused knew or should have known of the factual circumstances that established that protected status; and

(5) The attack took place in the context of and was associated with armed conflict.

b. *Comments.*

(1) The intent required for this offense precludes its applicability with regard to collateral damage or injury incident to a lawful attack.

5) **Pillaging**

a. *Elements.*

(1) The accused appropriated or seized certain property;

(2) The accused intended to appropriate or seize such property for private or personal use;

(3) The appropriation or seizure was without the consent of the owner of the property or other person with authority to permit such appropriation or seizure; and

(4) The appropriation or seizure took place in the context of and was associated with armed conflict.

b. *Comments.*

(1) As indicated by the use of the term "private or personal use," legitimate captures or appropriations, or seizures justified by military necessity, cannot constitute the crime of pillaging.

6) **Denying Quarter**

a. *Elements.*

(1) The accused declared, ordered, or otherwise indicated that there shall be no survivors or surrender accepted;

(2) The accused thereby intended to threaten an adversary or to conduct hostilities such that there would be no survivors or surrender accepted;

(3) It was foreseeable that circumstances would be such that a practicable and reasonable ability to accept surrender would exist;

(4) The accused was in a position of effective command or control over the subordinate forces to which the declaration or order was directed; and

(5) The conduct took place in the context of and was associated with armed conflict.

b. *Comments.*

(1) Element (3) precludes this offense from being interpreted as limiting the application of lawful means or methods of warfare against enemy

combatants. For example, a remotely delivered attack cannot give rise to this offense.

7) **Taking Hostages**

   a. *Elements.*

      (1) The accused seized, detained, or otherwise held hostage one or more persons;

      (2) The accused threatened to kill, injure, or continue to detain such person or persons;

      (3) The accused intended to compel a State, an international organization, a natural or legal person, or a group of persons to act or refrain from acting as an explicit or implicit condition for the safety or release of such person or persons; and

      (4) The conduct took place in the context of and was associated with armed conflict.

   b. *Comments.*

      (1) Consistent with Section 4(B) of this Instruction, this offense cannot be committed by lawfully detaining enemy combatants or other individuals as authorized by the law of armed conflict.

8) **Employing Poison or Analogous Weapons**

   a. *Elements.*

      (1) The accused employed a substance or a weapon that releases a substance as a result of its employment;

      (2) The substance was such that exposure thereto causes death or serious damage to health in the ordinary course of events, through its asphyxiating, poisonous, or bacteriological properties;

      (3) The accused employed the substance or weapon with the intent of utilizing such asphyxiating, poisonous, or bacteriological properties as a method of warfare;

      (4) The accused knew or should have known of the nature of the substance or weapon; and

      (5) The conduct took place in the context of and was associated with armed conflict.

   b. *Comments.*

      (1) The "death or serious damage to health" required by Element (2) of this offense must be a direct result of the substance's effect or effects on the human body (e.g., asphyxiation caused by the depletion of atmospheric

oxygen secondary to a chemical or other reaction would not give rise to this offense).

(2) The clause "serious damage to health" does not include temporary incapacitation or sensory irritation.

(3) The use of the "substance or weapon" at issue must be proscribed under the law of armed conflict. It may include chemical or biological agents.

(4) The specific intent element for this offense precludes liability for mere knowledge of potential collateral consequences (e.g., mere knowledge of a secondary asphyxiating or toxic effect would be insufficient to complete the offense).

## 9) Using Protected Persons as Shields

a. *Elements.*

(1) The accused positioned, or took advantage of the location of, one or more civilians or persons protected under the law of war;

(2) The accused intended to use the civilian or protected nature of the person or persons to shield a military objective from attack or to shield, favor, or impede military operations; and

(3) The conduct took place in the context of and was associated with armed conflict.

## 10) Using Protected Property as Shields

a. *Elements.*

(1) The accused positioned, or took advantage of the location of, civilian property or property protected under the law of war;

(2) The accused intended to shield a military objective from attack or to shield, favor, or impede military operations; and

(3) The conduct took place in the context of and was associated with armed conflict.

## 11) Torture

a. *Elements.*

(1) The accused inflicted severe physical or mental pain or suffering upon one or more persons;

(2) The accused intended to inflict such severe physical or mental pain or suffering;

8

    (3) Such person or persons were in the custody or under the control of the accused; and

    (4) The conduct took place in the context of and was associated with armed conflict.

  b. *Comments.*

    (1) Consistent with Section 4(B) of this Instruction, this offense does not include pain or suffering arising only from, inherent in, or incidental to, lawfully imposed punishments. This offense does not include the incidental infliction of pain or suffering associated with the legitimate conduct of hostilities.

    (2) Severe "mental pain or suffering" is the prolonged mental harm caused by or resulting from:

      (a) the intentional infliction or threatened infliction of severe physical pain or suffering;

      (b) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

      (c) the threat of imminent death; or

      (d) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality.

    (3) "Prolonged mental harm" is a harm of some sustained duration, though not necessarily permanent in nature, such as a clinically identifiable mental disorder.

    (4) Element (3) of this offense does not require a particular formal relationship between the accused and the victim. Rather, it precludes prosecution for pain or suffering consequent to a lawful military attack.

## 12) Causing Serious Injury

  a. *Elements.*

    (1) The accused caused serious injury to the body or health of one or more persons;

    (2) The accused intended to inflict such serious injury;

    (3) Such person or persons were in the custody or under the control of the accused; and

    (4) The conduct took place in the context of and was associated with armed conflict.

b. *Comments.*

    (1) "Serious injury" includes fractured or dislocated bones, deep cuts, torn members of the body, and serious damage to internal organs.

## 13) Mutilation or Maiming

a. *Elements.*

    (1) The accused subjected one or more persons to mutilation, in particular by permanently disfiguring the person or persons, or by permanently disabling or removing an organ or appendage;

    (2) The accused intended to subject such person or persons to such mutilation;

    (3) The conduct caused death or seriously damaged or endangered the physical or mental health or appearance of such person or persons.

    (4) The conduct was neither justified by the medical treatment of the person or persons concerned nor carried out in the interest of such person or persons;

    (5) Such person or persons were in the custody or control of the accused; and

    (6) The conduct took place in the context of and was associated with armed conflict.

## 14) Use of Treachery or Perfidy

a. *Elements.*

    (1) The accused invited the confidence or belief of one or more persons that they were entitled to, or were obliged to accord, protection under the law of war;

    (2) The accused intended to betray that confidence or belief;

    (3) The accused killed, injured, or captured one or more persons;

    (4) The accused made use of that confidence or belief in killing, injuring, or capturing such person or persons; and

    (5) The conduct took place in the context of and was associated with armed conflict.

**15) Improper Use of Flag of Truce**

   a. *Elements.*

     (1) The accused used a flag of truce;

     (2) The accused made such use in order to feign an intention to negotiate, surrender, or otherwise to suspend hostilities when there was no such intention on the part of the accused; and

     (3) The conduct took place in the context of and was associated with armed conflict.

**16) Improper Use of Protective Emblems**

   a. *Elements.*

     (1) The accused used a protective emblem recognized by the law of armed conflict;

     (2) The accused undertook such use for combatant purposes in a manner prohibited by the law of armed conflict;

     (3) The accused knew or should have known of the prohibited nature of such use; and

     (4) The conduct took place in the context of and was associated with armed conflict.

   b. *Comments.*

     (1) "Combatant purposes," as used in Element (2) of this offense, means purposes directly related to hostilities and does not include medical, religious, or similar activities.

**17) Degrading Treatment of a Dead Body**

   a. *Elements.*

     (1) The accused degraded or otherwise violated the dignity of the body of a dead person;

     (2) The accused intended to degrade or otherwise violate the dignity of such body;

     (3) The severity of the degradation or other violation was of such degree as to be generally recognized as an outrage upon personal dignity; and

     (4) The conduct took place in the context of and was associated with armed conflict.

b. *Comments.*

    (1) Element (2) of this offense precludes prosecution for actions justified by military necessity.

### 18) Rape

a. *Elements.*

    (1) The accused invaded the body of a person by conduct resulting in penetration, however slight, of any part of the body of the victim or of the accused with a sexual organ, or of the anal or genital opening of the victim with any object or any other part of the body;

    (2) The invasion was committed by force, threat of force or coercion, or was committed against a person incapable of giving consent; and

    (3) The conduct took place in the context of and was associated with armed conflict.

b. *Comments.*

    (1) Element (2) of this offense recognizes that consensual conduct does not give rise to this offense.

    (2) It is understood that a person may be incapable of giving consent if affected by natural, induced, or age-related incapacity.

    (3) The concept of "invasion" is linked to the inherent wrongfulness requirement for all offenses. In this case, for example, a legitimate body cavity search could not give rise to this offense.

    (4) The concept of "invasion" is gender neutral.

B. *Substantive Offenses—Other Offenses Triable by Military Commission.* The following enumerated offenses, if applicable, should be charged in separate counts. Elements are drafted to reflect conduct of the perpetrator. Each element need not be specifically charged.

### 1) Hijacking or Hazarding a Vessel or Aircraft

a. *Elements.*

    (1) The accused seized, exercised control over, or endangered the safe navigation of a vessel or aircraft;

    (2) The accused intended to so seize, exercise control over, or endanger such vessel or aircraft; and

    (3) The conduct took place in the context of and was associated with armed conflict.

12

b. *Comments.*

    (1) A seizure, exercise of control, or endangerment required by military necessity, or against a lawful military objective undertaken by military forces of a State in the exercise of their official duties, would not satisfy the wrongfulness requirement for this crime.

## 2) Terrorism

a. *Elements.*

    (1) The accused killed or inflicted bodily harm on one or more persons or destroyed property;

    (2) The accused:

        (a) intended to kill or inflict bodily harm on one or more persons;

or

        (b)  intentionally engaged in an act that is inherently dangerous to another and evinces a wanton disregard of human life;

    (3) The killing, harm or destruction was intended to intimidate or coerce a civilian population, or to influence the policy of a government by intimidation or coercion; and

    (4) The killing, harm or destruction took place in the context of and was associated with armed conflict.

b. *Comments.*

    (1) Element (1) of this offense includes the concept of causing death or bodily harm, even if indirectly.

    (2) The requirement that the conduct be wrongful for this crime necessitates that the conduct establishing this offense not constitute an attack against a lawful military objective undertaken by military forces of a State in the exercise of their official duties.

## 3) Murder by an Unprivileged Belligerent

a. *Elements.*

    (1) The accused killed one or more persons;

    (2) The accused:

        (a) intended to kill or inflict great bodily harm on such person or persons

or

        (b) intentionally engaged in an act that is inherently dangerous to another and evinces a wanton disregard of human life;

13

    (3) The accused did not enjoy combatant immunity; and

    (4) The killing took place in the context of and was associated with armed conflict.

b. *Comments.*

    (1) The term "kill" includes intentionally causing death, whether directly or indirectly.

    (2) Unlike the crimes of willful killing or attacking civilians, in which the victim's status is a prerequisite to criminality, for this offense the victim's status is immaterial. Even an attack on a soldier would be a crime if the attacker did not enjoy "belligerent privilege" or "combatant immunity."

## 4) Destruction of Property by an Unprivileged Belligerent

a. *Elements.*

    (1) The accused destroyed property;

    (2) The property belonged to another person, and the destruction was without that person's consent;

    (3) The accused intended to destroy such property;

    (4) The accused did not enjoy combatant immunity; and

    (5) The destruction took place in the context of and was associated with armed conflict.

## 5) Aiding the Enemy

a. *Elements.*

    (1) The accused aided the enemy;

    (2) The accused intended to aid the enemy; and

    (3) The conduct took place in the context of and was associated with armed conflict.

b. *Comments.*

    (1) Means of accomplishing Element (1) of this offense include, but are not limited to: providing arms, ammunition, supplies, money, other items or services to the enemy; harboring or protecting the enemy; or giving intelligence or other information to the enemy.

    (2) The requirement that conduct be wrongful for this crime necessitates that the accused act without proper authority. For example, furnishing enemy combatants detained during hostilities with subsistence or quarters in accordance with applicable orders or policy is not aiding the enemy.

14

(3) The requirement that conduct be wrongful for this crime may necessitate that, in the case of a lawful belligerent, the accused owe allegiance or some duty to the United States of America or to an ally or coalition partner. For example, citizenship, resident alien status, or a contractual relationship in or with the United States or an ally or coalition partner is sufficient to satisfy this requirement so long as the relationship existed at a time relevant to the offense alleged.

6) **Spying**

   a. *Elements.*

     (1) The accused collected or attempted to collect certain information;

     (2) The accused intended to convey such information to the enemy;

     (3) The accused, in collecting or attempting to collect the information, was lurking or acting clandestinely, while acting under false pretenses; and

     (4) The conduct took place in the context of and was associated with armed conflict.

   b. *Comments.*

     (1) Members of a military organization not wearing a disguise and others who carry out their missions openly are not spies, if, though they may have resorted to concealment, they have not acted under false pretenses.

     (2) Related to the requirement that conduct be wrongful or without justification or excuse in this case is the fact that, consistent with the law of war, a lawful combatant who, after rejoining the armed force to which that combatant belongs, is subsequently captured, can not be punished for previous acts of espionage. His successful rejoining of his armed force constitutes a defense.

7) **Perjury or False Testimony**

   a. *Elements.*

     (1) The accused testified at a military commission, in proceedings ancillary to a military commission, or provided information in a writing executed under an oath to tell the truth or a declaration acknowledging the applicability of penalties of perjury in connection with such proceedings;

     (2) Such testimony or information was material;

     (3) Such testimony or information was false; and

     (4) The accused knew such testimony or information to be false.

8) **Obstruction of Justice Related to Military Commissions**

    a. *Elements.*

        (1) The accused did an act;

        (2) The accused intended to influence, impede, or otherwise obstruct the due administration of justice; and

        (3) The accused did such act in the case of a certain person against whom the accused had reason to believe:

            (a) there were or would be proceedings before a military commission

                or

            (b) there was an ongoing investigation of offenses triable by military commission.

C. *Other Forms of Liability and Related Offenses.* A person is criminally liable as a principal for a completed substantive offense if that person commits the offense (perpetrator), aids or abets the commission of the offense, solicits commission of the offense, or is otherwise responsible due to command responsibility. Such a person would be charged as a principal even if another individual more directly perpetrated the offense. In proving culpability, however, the below listed definitions and elements are applicable. Additionally, if a substantive offense was completed, a person may be criminally liable for the separate offense of accessory after the fact. If the substantive offense was not completed, a person may be criminally liable of the lesser-included offense of attempt or the separate offense of solicitation. Finally, regardless of whether the substantive offense was completed, a person may be criminally liable of the separate offense of conspiracy in addition to the substantive offense. Each element need not be specifically charged.

1) **Aiding or Abetting**

    a. *Elements.*

        (1) The accused committed an act that aided or abetted another person or entity in the commission of a substantive offense triable by military commission;

        (2) Such other person or entity committed or attempted to commit the substantive offense; and

        (3) The accused intended to or knew that the act would aid or abet such other person or entity in the commission of the substantive offense or an associated criminal purpose or enterprise.

    b. *Comments.*

        (1) The term "aided or abetted" in Element (1) includes: assisting, encouraging, advising, instigating, counseling, ordering, or procuring

another to commit a substantive offense; assisting, encouraging, advising, counseling, or ordering another in the commission of a substantive offense; and in any other way facilitating the commission of a substantive offense.

(2) In some circumstances, inaction may render one liable as an aider or abettor. If a person has a legal duty to prevent or thwart the commission of a substantive offense, but does not do so, that person may be considered to have aided or abetted the commission of the offense if such noninterference is intended to and does operate as an aid or encouragement to the actual perpetrator.

(3) An accused charged with aiding or abetting should be charged with the related substantive offense as a principal.

## 2) Solicitation

a. *Elements.*

(1) The accused solicited, ordered, induced, or advised a certain person or persons to commit one or more substantive offenses triable by military commission; and

(2) The accused intended that the offense actually be committed.

b. *Comments.*

(1) The offense is complete when a solicitation is made or advice is given with the specific wrongful intent to induce a person or persons to commit any offense triable by military commission. It is not necessary that the person or persons solicited, ordered, induced, advised, or assisted agree to or act upon the solicitation or advice. If the offense solicited is actually committed, however, the accused is liable under the law of armed conflict for the substantive offense. An accused should not be convicted of both solicitation and the substantive offense solicited if criminal liability for the substantive offense is based upon the solicitation.

(2) Solicitation may be by means other than speech or writing. Any act or conduct that reasonably may be construed as a serious request, order, inducement, advice, or offer of assistance to commit any offense triable by military commission may constitute solicitation. It is not necessary that the accused act alone in the solicitation, order, inducement, advising, or assistance. The accused may act through other persons in committing this offense

(3) An accused charged with solicitation of a completed substantive offense should be charged for the substantive offense as a principal. An accused charged with solicitation of an uncompleted offense should be charged for the separate offense of solicitation. Solicitation is not a lesser-included offense of the related substantive offense.

*DoD MCI No. 2, April 30, 2003*

3) **Command/Superior Responsibility – Perpetrating**

   a. *Elements.*

      (1) The accused had command and control, or effective authority and control, over one or more subordinates;

      (2) One or more of the accused's subordinates committed, attempted to commit, conspired to commit, solicited to commit, or aided or abetted the commission of one or more substantive offenses triable by military commission;

      (3) The accused either knew or should have known that the subordinate or subordinates were committing, attempting to commit, conspiring to commit, soliciting, or aiding or abetting such offense or offenses; and

      (4) The accused failed to take all necessary and reasonable measures within his power to prevent or repress the commission of the offense or offenses.

   b. *Comments.*

      (1) The phrase "effective authority and control" in Element (1) of this offense includes the concept of relative authority over the subject matter or activities associated with the perpetrator's conduct. This may be relevant to a civilian superior who should not be held responsible for the behavior of subordinates involved in activities that have no relationship to such superior's sphere of authority. Subject matter authority need not be demonstrated for command responsibility as it applies to a military commander.

      (2) A commander or other military or civilian superior, not in command, charged with failing adequately to prevent or repress a substantive offense triable by military commission should be charged for the related substantive offense as a principal.

4) **Command/Superior Responsibility – Misprision**

   a. *Elements.*

      (1) The accused had command and control, or effective authority and control, over one or more subordinates;

      (2) One or more of the accused's subordinates had committed, attempted to commit, conspired to commit, solicited to commit, or aided or abetted the commission of one or more substantive offenses triable by military commission;

      (3) The accused knew or should have known that the subordinate or subordinates had committed, attempted to commit, conspired to commit, solicited, or aided or abetted such offense or offenses; and

      (4) The accused failed to submit the matter to competent authorities for investigation or prosecution as appropriate.

b. *Comments.*

(1) The phrase, "effective authority and control" in Element (1) of this offense includes the concept of relative authority over the subject matter or activities associated with the perpetrator's conduct. This may be relevant to a civilian superior who cannot be held responsible under this offense for the behavior of subordinates involved in activities that have nothing to do with such superior's sphere of authority.

(2) A commander or superior charged with failing to take appropriate punitive or investigative action subsequent to the perpetration of a substantive offense triable by military commission should not be charged for the substantive offense as a principal. Such commander or superior should be charged for the separate offense of failing to submit the matter for investigation and/or prosecution as detailed in these elements. This offense is not a lesser-included offense of the related substantive offense.

5) **Accessory After the Fact**

a. *Elements.*

(1) The accused received, comforted, or assisted a certain person;

(2) Such person had committed an offense triable by military commission;

(3) The accused knew that such person had committed such offense or believed such person had committed a similar or closely related offense; and

(4) The accused intended to hinder or prevent the apprehension, trial, or punishment of such person.

b. *Comments.*

(1) Accessory after the fact should be charged separately from the related substantive offense. It is not a lesser-included offense of the related substantive offense.

6) **Conspiracy**

a. *Elements.*

(1) The accused entered into an agreement with one or more persons to commit one or more substantive offenses triable by military commission or otherwise joined an enterprise of persons who shared a common criminal purpose that involved, at least in part, the commission or intended commission of one or more substantive offenses triable by military commission;

(2) The accused knew the unlawful purpose of the agreement or the common criminal purpose of the enterprise and joined in it willfully, that is, with the intent to further the unlawful purpose; and

(3) One of the conspirators or enterprise members, during the existence of the agreement or enterprise, knowingly committed an overt act in order to accomplish some objective or purpose of the agreement or enterprise.

b. *Comments*.

(1) Two or more persons are required in order to have a conspiracy. Knowledge of the identity of co-conspirators and their particular connection with the agreement or enterprise need not be established. A person may be guilty of conspiracy although incapable of committing the intended offense. The joining of another conspirator after the conspiracy has been established does not create a new conspiracy or affect the status of the other conspirators. The agreement or common criminal purpose in a conspiracy need not be in any particular form or manifested in any formal words.

(2) The agreement or enterprise must, at least in part, involve the commission or intended commission of one or more substantive offenses triable by military commission. A single conspiracy may embrace multiple criminal objectives. The agreement need not include knowledge that any relevant offense is in fact "triable by military commission."

(3) The overt act must be done by one or more of the conspirators, but not necessarily the accused, and it must be done to effectuate the object of the conspiracy or in furtherance of the common criminal purpose. The accused need not have entered the agreement or criminal enterprise at the time of the overt act.

(4) The overt act need not be in itself criminal, but it must advance the purpose of the conspiracy. It is not essential that any substantive offense be committed.

(5) Each conspirator is liable for all offenses committed pursuant to or in furtherance of the conspiracy by any of the co-conspirators, after such conspirator has joined the conspiracy and while the conspiracy continues and such conspirator remains a party to it.

(6) A party to the conspiracy who withdraws from or abandons the agreement or enterprise before the commission of an overt act by any conspirator is not guilty of conspiracy. An effective withdrawal or abandonment must consist of affirmative conduct that is wholly inconsistent with adherence to the unlawful agreement or common criminal purpose and that shows that the party has severed all connection with the conspiracy. A conspirator who effectively withdraws from or abandons the conspiracy after the performance of an overt act by one of the conspirators remains

guilty of conspiracy and of any offenses committed pursuant to the conspiracy up to the time of the withdrawal or abandonment. The withdrawal of a conspirator from the conspiracy does not affect the status of the remaining members.

(7) That the object of the conspiracy was impossible to effect is not a defense to this offense.

(8) Conspiracy to commit an offense is a separate and distinct offense from any offense committed pursuant to or in furtherance of the conspiracy, and both the conspiracy and any related offense may be charged, tried, and punished separately. Conspiracy should be charged separately from the related substantive offense. It is not a lesser-included offense of the substantive offense.

7) **Attempt**

  a. *Elements.*

    (1) The accused committed an act;

    (2) The accused intended to commit one or more substantive offenses triable by military commission;

    (3) The act amounted to more than mere preparation; and

    (4) The act apparently tended to effect the commission of the intended offense.

  b. *Comments.*

    (1) To constitute an attempt there must be a specific intent to commit the offense accompanied by an act that tends to accomplish the unlawful purpose. This intent need not involve knowledge that the offense is in fact "triable by military commission."

    (2) Preparation consists of devising or arranging means or measures apparently necessary for the commission of the offense. The act need not be the last act essential to the consummation of the offense. The combination of specific intent to commit an offense, plus the commission of an act apparently tending to further its accomplishment, constitutes the offense of attempt. Failure to complete the offense, whatever the cause, is not a defense.

    (3) A person who purposely engages in conduct that would constitute the offense if the attendant circumstances were as that person believed them to be is guilty of an attempt.

    (4) It is a defense to an attempt offense that the person voluntarily and completely abandoned the intended offense, solely because of the person's own sense that it was wrong, prior to the completion of the substantive offense. The voluntary abandonment defense is not allowed if the

*DoD MCI No. 2, April 30, 2003*

abandonment results, in whole or in part, from other reasons, for example, the person feared detection or apprehension, decided to await a better opportunity for success, was unable to complete the crime, or encountered unanticipated difficulties or unexpected resistance.

(5) Attempt is a lesser-included offense of any substantive offense triable by military commission and need not be charged separately. An accused may be charged with attempt without being charged with the substantive offense

## 7. EFFECTIVE DATE

This Instruction is effective immediately.

William J. Haynes II
General Counsel of the Department of Defense

# EXHIBIT F

FAX - 001 8028632573

To Robert D. Rachlin

Dear Robert

please try to pass my letter to my son Ghassan Al-Sharbi in which I urged him to fully cooperate with you and with Lieutenant W. C. Kubler while you are advocating for his case

Also you will find another letter from Ghassan's mother (in Arabic) urging him to do so

our Thanks and best regards to you and to Lieutenant Kubler

Sincerly Yours

A. Sharbi

Abdullah Al-Sharbi
P.o.Box 128247 Jeddah 2126
Saudi Arabia

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GHASSAN ABDULLAH AL SHARBI, )
)
)
     Petitioner, )    Civ. Act. No. 1:05-CV-2348
)
)
  v. )
)
GEORGE W. BUSH, President of the United )
States; DONALD RUMSFELD, United States )
Secretary of Defense; GORDON R. ENGLAND, )
Secretary of the United States Navy; JOHN D. )
ALTENBURG, JR., Appointing Authority for )
Military Commissions, Department of Defense; )
Brigadier General JAY HOOD, Commander, )
Joint Task Force, Guantánamo Bay, Cuba, and )
Colonel MICHAEL BUMGARNER, )
Commander, Joint Detention Group, Joint Task, )
Guantanamo Bay, Cuba )
)
     *Respondents*, all sued in their )
official capacities )
)

## CERTIFICATE OF SERVICE

I certify that on December 13, 2005, true and correct copies of Ghassan Abdullah

Al Sharbi's Amended Petition for Writ of *Habeas Corpus* and Complaint for Injunctive,

Declaratory and Other Relief were served by first class mail, postage prepaid, upon:

    Kenneth L. Wainstein, Esquire
    U.S. Attorney
    District of Columbia District
    Judiciary Center
    555 4th Street, NW
    Washington, DC  20530

    Alberto R. Gonzales, Esquire
    Attorney General of the United States
    U.S. Department of Justice
    Robert F. Kennedy Building
    Tenth Street & Constitution Ave., NW
    Room 5111
    Washington, DC  20530

Mr. George W. Bush
President of the United States
United States of America
The White House
1600 Pennsylvania Avenue, NW
Washington, DC  20301-1000


Mr. Donald Rumsfeld
Secretary, United States Department of Defense
1000 Defense Pentagon
Washington, DC  20301-1000


Mr. Gordon R. England
Secretary of the United States Navy
1000 Navy Pentagon
Washington, DC  20350-1000


Mr. John D. Altenburg, Jr.
Appointing Authority for Military Commissions
Department of Defense
Office of Military Commissions
1851 South Bell Street, Suite 103
Arlington, VA  22202


Army Brig. Gen. Jay Hood
Commander, Joint Task Force-GTMO
JTF-GTMO
APO AE  09360


Army Col. Michael Bumgarner
Commander, JDOG
JTF-GTMO
APO AE  09360

Dated:     December 13, 2005

Respectfully submitted,

Counsel for Petitioner:

_____
Robert D. Rachlin
*Appearing pursuant to Local Rule 83.2(g)*
Downs Rachlin Martin PLLC
PO Box 190
Burlington, VT 05402-0190
802-863-2375 (switchboard)
802-846-8327 (direct)
802-863-2573 (fax)
802-734-6280 (cell)
rrachlin@drm.com

BTV 462397 1

- 3 -