**U.S. Department of Justice**

Civil Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

June 30, 2008

The Honorable Royce C. Lamberth
The Honorable Thomas F. Hogan
  Judges of the U.S. District Court
  for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Chief Judge Lamberth and Judge Hogan:

Thank you for the meetings you convened on June 18 and 25 and the opportunity to discuss management of the Guantanamo Bay _habeas_ cases with you. We appreciate the administrative challenges presented to the court by the influx of active litigation in the district court, and we share many of those challenges. We also appreciate and share the court's desire to resolve these cases expeditiously.

To that end, we write to summarize some of the points that we previously have made. First, we describe the substantial resource commitment that the Department of Justice is making to handle these cases. Second, we discuss the process and timing for producing factual returns in these cases. Third, we identify some of the key procedural and substantive issues that we believe are best handled in a coordinated fashion.

    A.    Resources

The Department of Justice is dedicating substantial resources to facilitate the expeditious handling of these cases. At the time of the Supreme Court's decision in _Boumediene v. Bush_, the Federal Programs Branch of the Civil Division, which has handled the Guantanamo Bay detainee litigation in District Court for more than four years, had four attorneys dedicated almost full-time to deal with the various _habeas_ matters that remained active as we awaited the Supreme Court's decision. We have now received authorization to assign or detail approximately 50 attorneys to

The Honorable Royce C. Lamberth
The Honorable Thomas F. Hogan

these cases, including 30 attorneys from outside the Civil Division, and we are actively working to identify those attorneys and get them in place as quickly as possible.

      B.     The Filing of Factual Returns

      As discussed at the June 18 and 25 meetings, the government previously filed factual returns pertaining to approximately 100 of the detainees who remain at Guantanamo Bay. Those returns, filed four years ago, require updating. Moreover, in light of concerns such as those recently identified by the Supreme Court in *Boumediene*, and by the D.C. Circuit in *Parhat*, in many cases there will be materials that the government determines should either be removed from the factual returns or augmented to give context to those materials. Simply put, in the four years since most of the Combatant Status Review Tribunals ("CSRTs") were conducted, intervening court decisions have recently and significantly changed the legal landscape. In addition, over the last four years of the ongoing armed conflict against Taliban and Al Qaeda forces, United States military and intelligence personnel throughout the world have continued to gather new information that may be relevant to the habeas proceedings. Thus, the government, which is entitled to place before the court the best and most current evidence supporting a petitioner's detention as an enemy combatant, intends to file amended factual returns pertaining to these 100 or so petitioners, as well as initial factual returns for the 100 or so additional habeas petitioners

      Given the number of pending and expected *habeas* cases, development of these factual returns will be highly time-consuming for the Department of Justice, the Department of Defense, and any affected intelligence agencies. In order to process these factual returns efficiently, we propose to file approximately 50 returns per month beginning in 60 days. Processing at that rate would result in the filing of all factual returns for petitioners detained at Guantanamo over approximately a four-to-five month period. To be clear, the government will file the return in a given a case as soon as it is ready, and, once we file that return, the petitioner will be free to file his factual traverse, if any, and the case can then be adjudicated. We are by no means proposing, as some of petitioners' counsel at the June 25 meeting apparently misunderstood, for litigation in all cases to be delayed pending the filing of factual returns for all petitioners. Rather, under our proposed approach, at least 50 of these cases could be actively litigated on the merits beginning in approximately 60 days. Moreover, to the extent that coordination of these cases might reduce the need for extensive and duplicative motions practice over the next few months, and eliminate protracted disputes regarding the sequencing of cases, the government could redirect resources toward the goal of producing even more returns within that time frame.

      To begin active litigation of these cases, the parties not only need to identify additional attorneys to work on them – as both sides have recognized – but also need to provide for the proper treatment and handling of classified information by cleared counsel on both sides and by court personnel. That also will require some lead time, including on the part of the court and

2

The Honorable Royce C. Lamberth
The Honorable Thomas F. Hogan

court security officers, as discussed at the June 18 meeting. Indeed, petitioners' counsel themselves have highlighted their desire to seek some number of additional security clearances.[1] Nonetheless, to move these cases along as quickly as possible, many outstanding issues can be addressed during this lead time, as discussed below.

At the June 25 meeting, counsel for petitioners argued that the government should be required to proceed on existing CSRT records, or whatever could be haphazardly assembled in 14 (or perhaps 30) days for all petitioners. Such an approach will likely delay the ultimate resolution of these cases. We think it clear that the government is entitled to present its best case for the detention of persons found to be enemy combatants – which necessarily includes being able to take into account legal and intelligence developments during the four years since CSRTs were conducted. Any unreasonable curtailing of that opportunity not only would risk the erroneous release of enemy combatants, but also would present substantial grounds for appeal. Thus, under petitioners' approach, we may well find ourselves back before this court in a year's time, litigating many of these cases once again.

At the June 25 meeting, we proposed generally to process factual returns for identified petitioners in the order in which a person arrived at Guantanamo Bay. If it were administratively easier for the Court, we could also proceed generally in the order in which petitions were filed and cases were docketed. Under either scenario, there may be situations in which one individual factual return is significantly more complicated than others or some detainees' circumstances present unique issues, and we do not want the processing of such cases to delay overall processing. Therefore, we do not propose to adhere strictly to arrival or filing date as a rigid rule governing the order in which we file returns. Also, we propose to process the returns for the approximately 20 detainees charged with war crimes under the Military Commissions Act of 2006 after the returns for other current detainees; as discussed below, we believe habeas proceedings for such detainees should be dismissed or held in abeyance pending resolution of their pending prosecution. Finally, many petitions name detainees who are no longer in United States custody at Guantanamo Bay. We believe that those habeas petitions are moot and, in any event, are much less pressing that the petitions of current detainees. Accordingly, we propose to process the returns of released or transferred petitioners last, or not at all.

---

[1] As we explained at the June 25 meeting, the Civil Division has no interest in limiting the number of security clearances made available to petitioners' counsel in these cases. Of course, the organizations that own the classified information at issue do have an interest in ensuring that the circle of individuals permitted such access is not any wider than is necessary. Therefore, the government reserves the right to assert limitations based on the security judgments of the affected agencies. We will continue to work with the CSOs to seek a reasonable accommodation in this matter.

The Honorable Royce C. Lamberth
The Honorable Thomas F. Hogan

C.    Coordination of Issues

1.    Procedural Framework for Habeas Cases

We believe that in order for litigation to move efficiently and effectively, and to strike the proper constitutional balance between ensuring fairness to individual detainees and accommodating wartime exigencies, the court should follow the framework approved by the Supreme Court in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), for *habeas* challenges brought by citizen enemy combatants held in the United States.  Certainly, alien enemy combatants held at Guantanamo are entitled to no greater procedural protections.  Under the framework established in the controlling plurality opinion in *Hamdi*, after the government files its factual return, a petitioner may then file either a dispositive motion or their factual traverse, at which point the court would be best positioned to schedule a status conference to determine what motions are appropriate to resolve the case.

*Hamdi* makes clear that in developing the record in these cases, discovery generally will be inappropriate.  There the Supreme Court recognized that discovery into military operations would intrude upon sensitive secrets of national defense, and that this concern was properly taken into account in determining what process is due.  To that end, the Supreme Court explicitly rejected the process envisioned by the district court in *Hamdi*, which had "anticipated quite extensive discovery of various military affairs," 542 U.S. at 528, as one that did not "strik[e] the proper constitutional balance," *id.* at 532.  The court also rejected the notion that the appropriate process should approach that accompanying a criminal trial, instead concluding that "a habeas court in a case such as this may accept affidavit evidence." *Id.* at 538; *see also id.* at 534 (a "knowledgeable affiant" may "summarize" records supporting enemy-combatant determinations); *Boumediene*, 2008 WL 2369628, *38 ("*Habeas corpus* proceedings need not resemble a criminal trial, even when the detention is by executive order.").  Petitioners certainly would not be entitled to the entirety of "government Information" at issue in the D.C. Circuit decision in *Bismullah v. Gates*; the Supreme Court has vacated that decision (2008 WL 436928), and the decision in any event rested entirely on the Department of Defense's CSRT rules, which are not operative here.  In the government's view, to constitutionalize such an approach would be inconsistent with the "prudent and incremental" factfinding mandated by the Supreme Court in *Hamdi*. 524 U.S. at 539.  But in any event, disagreement over these issues – which will affect all cases – are but some of many common issues that would be best resolved by a single coordinating judge.

The development of the procedural framework in which these cases will be resolved presents important and common issues that will shape the parties' ultimate conduct of the litigation.  As we explained during the June 18 and 25 meetings, these issues include:

4

The Honorable Royce C. Lamberth
The Honorable Thomas F. Hogan

- the government's right to file amended factual returns in cases where returns were previously filed;

- the structure of a habeas hearing, including the order of presentation of the return and the petitioner's factual traverse;

- the scope of discovery, if any;

- the standard for obtaining an evidentiary hearing, if any;

- the permissibility of hearsay evidence;

- the availability of confrontation and compulsory process rights, if any; and

- the relevant burdens of proof.

Addressing all of theses issues separately in hundreds of individual actions simply makes no sense. To begin with, it would be massively wasteful and inefficient to brief common issues dozens of times before each of the judges on this court. Moreover, given the extent of uncertainty regarding appropriate procedures for *habeas* actions to review wartime status determinations, *see Boumediene*, 2008 WL 2369628, at *40 ("The extent of the showing required of the Government in these cases remains to be determined"); *id.* at *47 ("Our opinion does not address the content of the law that governs petitioners' detention. That is a matter yet to be determined."), the parties cannot efficiently or effectively prepare for more than 200 proceedings absent some generally-applicable guidance established at the outset. Indeed, in *Boumediene*, the Supreme Court expressly recognized the need for coordination and consolidation, anticipating that "[i]f, in a future case, a detainee files a habeas petition in another judicial district in which a proper respondent can be served, the government can move for change of venue to the court that will hear [the *Boumediene*] petitioners' cases, the United States District Court for the District of Columbia." 2008 WL 2369628, at *45. Such "[c]hanneling future cases to one district court," *id.*, would make little sense if common issues were still resolved different ways by different judges in individual cases. We do not, as petitioners' counsel have asserted, propose for all detainees' cases to be resolved in a class-action format, but simply believe that it is far more efficient for common legal and procedural issues to be resolved in a common manner. Thereafter, the merits of a given case can be decided by the assigned judge as early as possible. By contrast, under petitioners' approach, the parties would litigate the same legal and procedural issues repeatedly before 15 individual judges. The broad and unsettled character of these issues would all but ensure significant disagreement among individual district judges, which in turn would all but ensure a significant number of reversals and remands on appeal. In the long run,

The Honorable Royce C. Lamberth
The Honorable Thomas F. Hogan

that would not only waste judicial and party resources, but also would cause the very delay that petitioners' counsel assertedly seek to avoid.

To facilitate the prompt and orderly resolution of common issues, we recommend that, even as the government begins preparing factual returns, the parties should submit briefing on common procedural issues to Judge Hogan, as coordinating judge, who could then adopt a case management order addressing these issues. Under this approach, we would propose to begin briefing such issues in the next 30 days, and would hope to have the issues resolved even before petitioners file their factual traverses. Of course, to the extent either side believes that any of the issues presented to Judge Hogan would best be resolved by separate judges in individual cases, that party could make those arguments to him. To the extent Judge Hogan resolved some or all of the issues on a common basis, the parties would have immediate guidance going forward, and the outstanding legal disputes would thus have been narrowed. Conversely, to the extent Judge Hogan classified any of the disputed issues as individual ones, the parties would have suffered no prejudice for having tried, at the outset, to resolve on a common basis as many issues as possible. Alternatively, if the judges conclude that all procedural issues should be resolved in the context of specific cases, we propose that a subset of the first 50 cases in which amended or initial factual returns are filed could be consolidated before Judge Hogan, as coordinating judge, for determination of procedural issues in the specific context of test cases. (The merits of these cases would still be addressed by their individual assigned judges.) Were the court to consolidate these procedural issues before Judge Hogan, either for some generalized determinations at the outset or for determination in the context of test cases, the government would agree to abide by his rulings as binding for all Guantanamo habeas cases pending before this court, subject only to reserving the right to appeal.

2.    Cross-Cutting Legal Issues That Warrant Coordination

We also would ask for the adoption of a standing order in all cases under which motions (other than dispositive motions filed in response to factual returns) may not be filed without first conferring with the court. After the decision in *Rasul v. Bush*, 542 U.S. 466 (2004), petitioners filed a flurry of motions addressing a variety of issues, such as notice prior to transfer from Guantanamo, conditions of confinement, counsel-detainee visit priorities and practices, and other matters. Indeed, since the *Rasul* decision, over one hundred motions have been filed seeking notice prior to transfer, and scores of motions have been filed raising conditions-of-confinement issues. Dozens of motions seeking various forms of relief have been filed in the two and a half weeks since *Boumediene* was decided. Responding to such motions separately in each individual case would be extraordinarily burdensome and would detract from the government's resources (as well as the court's) in doing the important work of processing factual returns, litigating potentially dispositive legal issues, and adjudicating the merits of these cases. Rather than proceed *ad hoc* in individual cases, such motions, which present issues cutting across the Guantanamo habeas cases, are most appropriately addressed by Judge Hogan as coordinating

6

The Honorable Royce C. Lamberth
The Honorable Thomas F. Hogan

judge. Petitioners' claim that motions pertaining to transfer or conditions claim are inherently fact-dependant ignores the arguments the government has made in such cases. With respect to notice of transfer, the government's principal arguments are legal ones addressing the authority of the judiciary to require such notice. Similarly, the government's arguments as to conditions claims primarily involve legal arguments applicable to all cases, including the continued applicability of Section 7 of the Military Commissions Act, to the extent that it withdraws court jurisdiction over conditions-of-confinement claims by detainees held as enemy combatants. Petitioners may dispute the government's position on these questions, but they cannot fairly dispute that our position raises common questions – and ones distinct from the merits of petitioners' challenge to their detention as such.

As discussed at the June 18 and 25 meetings, one important issue, common to all cases, is the entry of an amended protective order. The protective order previously adopted in the district court provides a good model; however, it could warrant updating to reflect various concerns. We understand that some of those concerns have been identified by the CSOs, and the government has identified concerns of its own. Any proposed amendments to the protective order could be briefed and adjudicated without delay. Moreover, issues relating to administration of the protective order have arisen with some regularity. We propose (and believe that petitioners' counsel generally agree) to have Judge Hogan, as coordinating judge, address those issues. Likewise, we propose having Judge Hogan oversee the development of a protective order for use in cases involving high-value detainees," whose cases implicate distinctive concerns due to the presence of SCI information.

It may be that guidance could be expeditiously obtained from the Court of Appeals on several of these common issues, some of which had been briefed on appeal prior to enactment of the DTA and MCA. First, the government's authority to withhold a narrow subset of classified evidence from petitioners' counsel was presented in an appeal from *In re Guantánamo Detainee Cases*, No. 04-01254-HHK (Jan. 31, 2005) (Doc. 100). *See Al Odah v. United States*, D.C. Cir. No. 05-5117. Second, the petitioners' claim of entitlement to notice prior to transfer was raised in scores of cases. *See, e.g.*, *Kiyemba v. Bush*, D.C. Cir. No. 05-5487. Third, the applicability of the Military Commissions Act to conditions of confinement claims is pending in *Paracha v. Bush*, D.C. Cir. No. 05-5149. The government will seek definitive rulings on these issues from the court of appeals. Moreover, to the extent appropriate, we would encourage you to raise these cases with the Chief Judge of the Court of Appeals, as prompt resolution of these issues by the Court of Appeals would be helpful to all concerned.

Finally, we would propose to begin briefing immediately one additional threshold legal issue: whether the filing of charges against a detainee before a military commission should require the detainee's habeas proceeding to be dismissed or held in abeyance pending resolution of the commission prosecution. At present, 20 detainees have been so charged, and most of them have pending *habeas* petitions. Resolution of that issue in favor of the government would

7

The Honorable Royce C. Lamberth
The Honorable Thomas F. Hogan

effectively suspend those cases at least for the time being.  Because this issue arises in many individual cases, we would propose that it be briefed before Judge Hogan, as coordinating judge.

        In closing, we share the court's commitment to expedited resolution of these cases. When Judge Green had the petitions of a few dozen detainees coordinated before her in 2004, the district court received factual returns and was able to decide threshold legal motions in those cases in approximately six months  Now, with the petitions involving up to approximately 280 detainees pending, or likely soon to be pending, we are proposing a schedule and procedure that should allow the court to resolve approximately five times as many cases, on the merits, over the course of the next 12 to 18 months.  We look forward to working with the court and the petitioners' counsel to achieve that goal.

                                Respectfully,

                                Gregory G. Katsas
                                Acting Assistant Attorney General

cc:     Shane Kaddidal
        Neal Katyal
        Robert Kirsch
        A.J. Kramer
        Thomas Sullivan
        David Remes
        Stephen Truitt
        Sabin Willett

8