IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GHASSAN ABDULLAH AL SHARBI<br>BY HIS NEXT FRIEND,<br>ABDULLAH AL SHARBI | )<br>)<br>)<br>) | |
| Petitioner | ) | CV 05-2348 (EGS) |
| | ) | |
| v. | ) | |
| | ) | |
| GEORGE W. BUSH, ET AL., | ) | |
| | ) | |
| Respondents | )<br>) | |

**PETITIONER'S REPLY TO RESPONDENT'S BRIEF [DOCUMENT #53]**

I.   **WAR – THE HEGEMONY OF A METAPHOR**

The Court has directed the parties to put forth their positions on the procedures to be followed in this case. Respondents have contextualized their position within a framework of war. Throughout the Respondents' Brief, reference is made, directly or indirectly, to the broad war powers of the President. A few examples will suffice (emphasis added, except where indicated otherwise):

"Congress confirmed the President's authority to detain enemy combatants in this *war*" (p. 2).

"Any such discovery must also take account of the exigencies posed by ongoing *warfare* . . .." (p. 4).

"Although *Boumedienne* [Respondents' italics] did not specify the precise procedural rules for constitutional habeas proceedings involving *wartime* status determinations . . .." (p.7).

"The President has the legal authority to detain enemy combatants in the *war authorized*[1] by Congress in the Authorization for Use of Military Force . . .." (p. 13).

"Delegation of authority in connection with *war powers* should be construed to provide 'broad discretion' . . .." (p. 16).

"'Grant of *war power* includes all that is necessary and proper for carrying [the President's war powers] into execution'" (P. 17).

"Such powers indisputably include the authority to capture and detain enemy combatants in *wartime*, at least for the duration of the conflict" (p. 17).

Few will dispute that, in time of war, the power of the executive is broadened well beyond what would be acceptable in time of peace.  The position of Respondents is founded on the assumption that the United States is presently engaged in such a war.  The rhetoric of war is not, of course, confined to Respondents' Brief.  It informs the pronouncements of the Administration, has become an element of our political discourse, and is casually used even by the United States Supreme Court.[2]  But is the "war on terror" such a phenomenon as implicates the broad wartime powers of the President, merely because the word "war" is used to describe it?

By common understanding, a war in the literal sense involves enemy nation states, armed forces, winners, losers (or a truce), a beginning, and an end.  The United States experienced several such wars in the twentieth century.  The Korean and Vietnam conflicts, although they didn't end with a clear victory by any side, were certainly wars in that they involved nation

---

[1] Of course, no "war" was "authorized or declared by Congress in the AUMF.

[2] In *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (plurality), the Court quotes *Ex parte Quirin*, 317 U.S. 1, 28 (1942) – a case which was rendered undeniably in the context of a war in the conventional sense – to the effect that the capture and detention of unlawful enemy combatants are "important incident[s] of war." (Cited in Respondents' Brief, p. 6).  The Supreme Court does not examine the fundamental question:  is the "war on terror" a "war" in the conventional sense?

DOWNS
RACHLIN
MARTIN PLLC

2

states in armed conflict, ending in a truce among the combatant states. History is, sadly, replete with armed conflicts that would satisfy any definition of "war" in a literal sense.

The word "war" has been commonly used in our political and popular discourse in a metaphorical, as well as the literal, sense. The "war on drugs," the "war on poverty," the "war on crime," not to overlook Bill O'Reilly's fancied "war on Christmas" are all examples of the use of "war" in a plainly metaphorical sense. No one supposes that, e.g., the "war on poverty" will command the kind of national mobilization and armed violence that are deployed in literal wars.

Where, on the continuum from the metaphorical to the literal, does the "war on terror" lie? Is it, for example, more like World War II or more like the war on poverty? Like conventional wars, the "war on terror" has episodes of violence with the use of the weapons of conventional wars. Unlike conventional wars, the "war on terror" does not confront the United States with a nation state as an enemy. Perhaps the "war on terror" falls somewhere between the extremes of the metaphorical and the literal, and counsel does not presume to judge just where on that continuum it may lie. Suffice it to say that a "war" that in significant part is metaphorical cannot be assumed to bring with it all the incidents of a conventional, literal war – including the broadened war powers of the President. As David Zarefsky has noted:

> "[a] key function of presidential rhetoric is to define social reality."[3]

---

[3] David Zarefsky, "Presidential Rhetoric and the Power of Definition," 34 (3) Presidential Studies Quarterly (2004): 607-619, 607.

DOWNS RACHLIN MARTIN PLLC

3

He goes on to write that

> "the president, by defining a stiuation, might be able to shape the context in which events or proposals are viewed by the public."[4]

By the use of "war" as a defining concept of the current confrontation with Islamist terrorists, the Administration has succeeded, to a great extent, in "setting the limits of debate and/or reality" and "the closing of hermeneutic doors."[5] Judges are as apt as other citizens to slip into the closed reality of popular rhetoric, when the events in question as as shattering as the attack of 9/11. Thus, it is suggested, courts need to especially cautious in assuming that a coinage containing the word "war" automatically implies the full mobilization of resources and the expanded executive powers applicable to a war in the literal sense. Stated differently, it is submitted that courts should be critical in accepting the redefined reality implicit in the metaphorical use of "war" as a tool in reshaping the world to suit a view which, while popular, may not warrant the wholesale importation of measures and restrictions that would be appropriate when "war" describes the actual, rather than the metaphorical, state of affairs.

The temptation to ignore this distinction is evident in Respondents' Brief. Respondents promote the Authorization for the Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001) ("AUMF") to the confirmation of a war. ("In the Authorization for the Use of Military Force . . .Congress confirmed the President's authority to detain enemy combatants in this *war*" (emphasis added). Respondents' Brief, p. 2.)

---

[4] Zarefsky, at 611.

[5] J. Maggio, "The Presidential Rhetoric of Terror: The (Re)Creation of Reality Immediately after 9/11," 35 (4) Politics and Policy (2007): 810-835,

DOWNS RACHLIN MARTIN PLLC

4

Respondents are quite explicit: "The President has the legal authority to detain enemy combatants *in the war authorized by Congress* in the [AUMF] . . .." (emphasis added). Respondents' Brief, p. 13. The U.S. Constitution, Art. I, sec. 8, reposes in Congress the power "to declare war." The AUMF was not a declaration of war. It authorized the President

> "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons."

Congress, in section 2(b)(1) of the AUMF, recited the specific authorization required by section 8(a)(1) of the War Powers Resolution, Pub. L. 93-148, 93rd Congress, H. J. Res. 542, November 7, 1973. It was only because the *War* Powers Resolution required specific congressional warrant for the introduction of troops that "war" was mentioned at all. Other than references to the War Powers Resolution, the AUMF contains not a single mention of the word "war."

It is not Petitioner's purpose to invite the Court to invest the phrase "war on terror" with a precise meaning or to ascertain the exact dimensions of such broadened powers as the President may have pursuant to the AUMF. The purpose is, rather, to caution the Court against an unwary acceptance of Respondents' use of the rhetoric of war in measuring the procedures to be adopted in the instant case. As Professor Lori Hartmann-Mahmud has written:[6]

---

[6] Lori Hartmann-Mahmud, "War as Metaphor," Peace Review 14.4 (2002): 427-32, at 32.

> "In the context of a war on terrorism, language has proven to be the determinant of action. The war on terrorism is not just a play on words or a literary technique. It has sent us carelessly into a war that has no clear enemies (or allies), no effective weapons, and no possible ending."

As the Court settles on the procedures to be employed in this case, it should have in mind that Respondents' repeated references to war and war powers should not be viewed uncritically as validation of their fundamental position that Petitioner and other detainees have only those rights which would apply to an enemy in a time of war in the literal and conventional sense. In short, the metaphoric character of the "war" on terror should not be permitted to expand its reach to comprise the incidents of literal, conventional war. The metaphor of war, in the usage of the Administration and these Respondents, has quietly enlarged its hegemony beyond the rhetorical and literary and pretends now to a robust meaning that cannot rationally or historically be applied to it.

## II.   PROCEDURE GOING FORWARD

### A. In the Unusual Circumstances of this Case, the Burdens of Proof and Persuasion should Rest on Respondents to Justify Petitioner's Detention.

Ordinarily, the burdens of proof and persuasion rest on the habeas corpus petitioner to justify the claim that his or her detention is unlawful. *Frates v. Bohlinger*, 472 F.2d 149, 151 (1st Cir. 1973); CJS Habeas Corpus §330. Typically, courts place the burden on petitioner where the petition is founded on a specific claimed deprivation of right or constitutional flaw in the proceedings. *Frates, supra* (trial court denial of continuance); *U. S. ex rel. Schnitzler v. Follette*, 406 F.2d 319, 321 (2d Cir. 1969) ("ends of justice" as requiring reexamination of earlier denial of petition); *U.S. ex rel. Wissenfeld v. Wilkins*, 281 F.2d 707, 713 (2d Cir. 1960)

(claim that prosecutor breached plea agreement). The same principle concededly applies, *mutatis mutandis*, to claims of ineffective assistance of counsel, *Batson* claims about the selection of the jury – in short, to habeas petitions in which a specific event, circumstance, or condition is asserted to vitiate the legality of the petitioner's detention. Federal and state habeas corpus claims almost always arise post-conviction. In such cases, there has been a charge, trial, and conviction by officials and tribunals, the fundamental regularity and constitutionality of whose procedures are assumed. Such petitions depend on specific allegations of fact. Consistent with the classic rule that he who asserts a fact has the burden of proving it, the burdens of proof and persuasion fall on the petitioner in the typical habeas case.

But this is not a "typical case."

The procedures by which the detention of Petitioner (and others similarly situated) are determined are not adversarial and not consistent with procedures customary at common law or under the Uniform Code of Military Justice:

- Detainees at Guantánamo appear before the Combatant Status Review Tribunal (CSRT) without counsel.

- Detainees are accompanied by a "personal representative," not a lawyer, who has no duty to advocate on the detainee's behalf.

- The status of detainees as unlawful enemy combatants is resolved on the basis of evidence, some or all of which, is hidden from the detainee. The record of the CSRT proceedings pertinent to this Petitioner (Document 45, Exhibit A, Bates-stamped page 000009) recites: "The Tribunal relied on certain classified evidence in reaching its decision." Further, on Bates-stamped page 000007, the narrative

states: "In reaching its conclusions, the Tribunal considered both classified and unclassified information."

- There are no rules of evidence.
- The narrative (Bates-stamped page 000007) recites that the Petitioner was captured in March 2002.
- The CSRT hearing on Petitioner's case took place on November 8, 2004 (Bates-stamped page 00017), more than two-and-a-half years after Petitioner was captured.

Thus, this is a case that falls outside the common rules for allocating the burdens of proof and persuasion.

> "[W]ith respect to certain factual issues, the burden of proof may be shifted to the state because of specific policy considerations or because the available evidence is likely to be in the hands of the state."

CJS Habeas Corpus § 330. Petitioner's case is, by Respondents' admission, one in which "the available evidence is . . . in the hands of the state." To require Petitioner to assert the factual basis on which he contends that there are factual flaws in the basis of his detention places him in the impossible position of rebutting evidence of which he is unaware, evidence that has been intentionally concealed from him.

Therefore, the burdens of proof and persuasion should rest with Respondents, who have detained Petitioner for more than six years. Petitioner should be afforded an opportunity to rebut any and all evidence on the basis of which Respondents seek to justify his continued detention. Respondents should be obliged to show, *inter alia*, that Petitioner has committed acts which transgress international norms of conduct, including *jus cogens*. Respondents should not be

licensed to justify Petitioner's detention on the basis of acts or omissions which are unrecognized as violative of international norms, including *jus cogens*.

### B. Traditional Rules of Confrontation and Compulsion May Be Inapplicable to the Extent that there is no Practial Way that those Procedures Can Be Employed.

Petitioner acknowledges that it may not be reasonably practical to bring before the Court either the persons of Petitioner or of <u>some</u> witnesses with testimony to offer against him. Unavoidably, this Court will be constrained to rely to some extent on hearsay. Such departures from the rules of evidence should be indulged sparingly and only to the extent that this Court determines that no practical alternative exists. While the production of witnesses *in vivo* will undoubtedly impose costs and inconvenience on Respondents, such burdens should be weighed against the burden imposed on Petitioner of detention for more than six years without anything approaching a trial.[7]

Petitioner's rights of confrontation and compulsion should be honored by this Court, except to the extent that this Court determines that it is seriously impractical for Respondents to comply with such procedures.

### C. The Right to an Evidentiary Hearing is Discretionary and should be Granted in this Case.

The grant or denial of an evidentiary hearing in a habeas corpus case is ordinarily confided to the sound discretion of the Court. *Thomas v. State of Arizona*, 356 U.S. 390, 403, 78 S.Ct. 885, 892 (1958).

---

[7] Charges have been preferred against Petitioner with a view to trial before the Military Commission. However, to the best of his counsel's information and belief, these charges have not yet been "referred," a preliminary necessary to further proceedings before the Commission. Although Petitioner did appear before the previous

> "There are considerations, however, which in certain cases make exercise of the power of the court to grant a hearing mandatory, as where a petitioner did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding."

CJS Habeas Corpus § 359 . *See, also Com. of Pa. ex rel. Herman v. Claudy*, 350 U.S. 116, 120-121, 76 S.Ct. 223, 226 (1956) (referring to "the kind of dispute that should be decided only after a hearing").

Clearly, there is no reliable way that this Court can pass on the lawfulness of Petitioner's detention by reliance solely upon the CSRT proceedings. But the precise extent to which an evidentiary hearing is necessary can be determined only after Respondents have complied with the Court's July 31, 2008 ORDER [45] and filed a factual return, which is due under that ORDER by August 29, 2008.

The extract from *Boumediene v. Bush*, 128 S.Ct. 2229, 2270 (2008), quoted by this Court on pages 2-3 of its ORDER [45] points to the necessity of an evidentiary hearing in this case. ("[T]he court must have the means to correct errors that occurred during the CSRT proceedings. This includes some authority to assess the sufficiency of the Government's evidence against the detainee."). Obviously, the correction of errors and assessment of evidentiary sufficiency cannot be accomplished without an evidentiary hearing.

The particulars and scope of such an evidentiary hearing will rest in the sound discretion of the Court. However, Petitioner respectfully contends, it would be an abuse of discretion to deny an evidentiary hearing altogether.

---

Commission on April 27, 2006, that Commission was invalidated by the U.S. Supreme Court in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006). Petitioner has not appeared before the current Military Commission.

DOWNS
RACHLIN
MARTIN PLLC

10

**D. The CSRT Proceedings should Play no Rôle in this Court's Ruling on the Petition.**

The defects in the CSRT proceeding have previously been noted and are, in any case, well known to the Court. The inquisitorial procedures employed by the CSRT are no substitute for an adversarial proceeding in which evidence is presented and contested in accordance with the accepted rules of Anglo-American court procedure. While Petitioner has acknowledged that the realities of the situation may preclude assiduous adherence to those rules in all instances, the Court should deploy them to the extent that it is possible to do so.

The CSRT "findings" have no probative worth whatsoever and should be disregarded by the Court, except as they may be a useful template indicative of the general nature of the grounds on which Respondents claim to detain Petitioner.

**E. Petitioner has had a "Voluntary Connection" to the United States.**

In their Brief [53}, p. 11, Respondents rely on "the well-established holding that the Fifth Amendment and other individual rights secured by the Constitution do not apply to alien enemy combatants lacking any voluntary connection to the United States," citing *Verdugo-Urquidez*, 494 U.S. 259 (1990) and *Johnson v. Eisentrager*, 339 U.S. 783 (1950). It should be noted in this connection that this Petitioner <u>has</u> had a "voluntary connection to the United States." At Bates-stamped page 00026 of Respondents' Exhibit B [55], it is stated: "AL-SHARBI arrived in the United States in 1997. He obtained a student visa and enrolled in [REDACTED]. AL-SHARBI said that he picked this college based on the recommendation from a distant relative . . ..[who AL-SHARBI believes] now lives in the Tulsa, Oklahoma area."



Whatever validity Respondents' attempt to abridge the rights of detainees by reason of the absence of a "voluntary connection" with the United States may have, this consideration does not apply to this Petitioner.

### F. Discovery should be Ordered, in the Court's Discretion.

The grant or denial of discovery is ordinarily a matter resting within the sound discretion of the Court. *Lonchar v. Thomas*, 517 U.S. 314, 326, 116 S.Ct. 1293, 1300 (1996), citing Habeas Corpus Rule 6(a). That broad principle should apply in this case. It must be noted, however, that

> "While the district court generally has discretion to grant or deny discovery requests under Rule 6 [of the Rules Governing Habeas Corpus Cases under Section 2254], a court's blanket denial of discovery is an abuse of discretion if discovery is 'indispensable to a fair, rounded, development of the material facts.'"

*East v. Scott,* 55 F.3d 996, 1001 (5th Cir.1995) (quoting *Coleman v. Zant,* 708 F.2d 541, 547 (11th Cir.1983)).

Specific discovery cannot be suggested until the factual return has been filed and Petitioner's counsel has examined it, a procedure which will likely require a trip to the Secure Facility in the Washington metro area, if "protected information" is included in the factual return.

Burlington, Vermont.  August 19, 2008.

                        Respectfully submitted,

/s    Robert D. Rachlin
DOWNS RACHLIN MARTIN PLLC
PO Box 190
199 Main Street
Burlington, VT 05402-0190
Tel. (802) 846-8327
rrachlin@drm.com

2789406.1